**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ***ex rel.*** **WENDY A. BAHNSEN and** ) | |
| **CAROLINA H. FUENTES, and on behalf** ) | **Honorable Susan D. Wigenton** |
| **of the STATES of CALIFORNIA,** ) | |
| **COLORADO, CONNECTICUT,** ) | |
| **DELAWARE, FLORIDA, GEORGIA,** ) | **Civil Action No. 11-cv-1210** |
| **HAWAII, ILLINOIS, INDIANA,** ) | |
| **LOUISIANA, MASSACHUSETTS,** ) | |
| **MICHIGAN, MINNESOTA, MONTANA,** ) | |
| **NEVADA, NEW JERSEY, NEW** ) | |
| **MEXICO, NEW YORK, NORTH** ) | |
| **CAROLINA, OKLAHOMA, RHODE** ) | |
| **ISLAND, TENNESSEE, TEXAS,** ) | |
| **VIRGINIA, WISCONSIN, and THE** ) | |
| **DISTRICT OF COLUMBIA** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BOSTON SCIENTIFIC** ) | |
| **NEUROMODULATION** ) | |
| **CORPORATION,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | **JURY TRIAL DEMANDED** |
| ) | |

**FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS**

**TABLE OF CONTENTS**

Page

I.     JURISDICTION AND VENUE ...................................................................2

II.    PARTIES ...................................................................................................3

       A.     Relator Wendy A. Bahnsen ........................................................3

       B.     Relator Carolina H. Fuentes ......................................................4

       C.     Defendant Boston Scientific Neuromodulation Corporation ...................5

       B.     BSNC's Billing and Collections Backlog ..................................8

       D.     BSNC's False Certifications on CMS-1500 Claim Forms...........................26

IV.    THE DEFENDANT'S CONCEALMENT OF DEFECTIVE EQUIPMENT AND
       PATIENT HARM FROM THE GOVERNMENT..............................................29

       A.     Regulatory Framework: Medical Device Reporting ..................31

       B.     Recall of Precision™ Charger 1.0 ............................................32

       C.     Continuing Reports of Patient Harm and Defects .......................33

V.     BSNC's Fraudulent Kickback Schemes................................................37

VI.    DEFENDANT DEFRAUDED GOVERNMENT PROGRAMS, INCLUDING
       MEDICARE AND MEDICAID .....................................................................42

       C.     Medicaid .......................................................................................49

VII.   UNLAWFUL RETALIATION AGAINST RELATORS BAHNSEN AND
       FUENTES ...................................................................................................55

**COUNT I** (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1); 31 U.S.C. §
        3729(A)(1)(A))...................................................................................59

**COUNT II** (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(2); 31 U.S.C. §
        3729(A)(1)(B)) ...................................................................................60

**COUNT III** (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(H)) ..........................61

**COUNT IV** (VIOLATION OF CALIFORNIA FALSE CLAIMS ACT) ...................................61

**COUNT V** (VIOLATION OF COLORADO MEDICAID FALSE CLAIMS ACT)..................62

i

**COUNT VI** (VIOLATION OF CONNECTICUT FALSE CLAIMS ACT) ................................63

**COUNT VII** (VIOLATION OF DELAWARE FALSE CLAIMS AND REPORTING ACT) ...65

**COUNT VIII** (VIOLATION OF DISTRICT OF COLUMBIA FALSE CLAIMS ACT)...........66

**COUNT IX** (VIOLATION OF FLORIDA FALSE CLAIMS ACT) ...........................................67

**COUNT X** (VIOLATION OF GEORGIA FALSE MEDICAID CLAIMS ACT) .......................68

**COUNT XI** (VIOLATION OF HAWAII FALSE CLAIMS ACT) .............................................70

**COUNT XII** (VIOLATION OF ILLINOIS FALSE CLAIMS WHISTLEBLOWER REWARD
AND PROTECTION ACT) ..............................................................71

**COUNT XIII** (VIOLATION OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER
PROTECTION ACT)........................................................................72

**COUNT XIV** (VIOLATION OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS
INTEGRITY LAW) ..........................................................................73

**COUNT XV** (VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACT) .........................75

**COUNT XVI** (VIOLATION OF MICHIGAN MEDICAID FALSE CLAIMS ACT) ................76

**COUNT XVII** (VIOLATION OF MINNESOTA FALSE CLAIMS ACT)................................77

**COUNT XVIII** (VIOLATION OF MONTANA FALSE CLAIMS ACT) .................................79

**COUNT XIX** (VIOLATION OF NEVADA FALSE CLAIMS ACT)........................................80

**COUNT XX** (VIOLATION OF NEW JERSEY FALSE CLAIMS ACT)..................................81

**COUNT XXI** (VIOLATION OF NEW MEXICO MEDICAID FALSE CLAIMS ACT)...........82

**COUNT XXII** (VIOLATION OF NEW YORK FALSE CLAIMS ACT)..................................84

**COUNT XXIII** (VIOLATION OF NORTH CAROLINA FALSE CLAIMS ACT) ...................85

**COUNT XXIV** (VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT) ..........86

**COUNT XXV** (VIOLATION OF RHODE ISLAND FALSE CLAIMS ACT)...........................87

**COUNT XXVI** (VIOLATION OF TENNESSEE MEDICAID FALSE CLAIMS ACT) ...........89

**COUNT XXVII** (VIOLATION OF TEXAS MEDICAID FRAUD PREVENTION ACT)........90

**COUNT XXVIII** (VIOLATION OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT).....91

**COUNT XXIX** (VIOLATION OF WISCONSIN FALSE CLAIMS FOR MEDICAL
ASSISTANCE LAW) ......................................................................................93

### FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729, ET SEQ. AND STATE LAW COUNTERPARTS

1.     This is an action brought on behalf of the United States of America and the above-named *Qui Tam* States by Wendy A. Bahnsen and Carolina H. Fuentes (collectively "Relators"), by and through their attorneys, against Defendant Boston Scientific Neuromodulation Corporation pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*; the California False Claims Act, Cal. Gov't Code § 12650 *et seq.* (Deering 2000); the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 *et seq.*(2010); the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.* (2010); the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.* (2000); the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.* (2000); the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* (2007); the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* (2000); the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.* (2006)*;* the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.* (2007); the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.* (2007); the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.* (2011); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.* (1999); the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* (West 2007); the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.* (2007); the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* (2010);

the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.* (2007); the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (2006); the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* (West 2006); the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011); and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* (2007) ("State *qui tam* statutes" or "*Qui Tam* States").

2.     This is an action to recover damages and civil penalties on behalf of the United States of America and the *Qui Tam* States (collectively the "Government") arising from false and fraudulent statements, records and claims made and caused to be made by the Defendant, its agents and employees, in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* as amended ("the FCA") and State *qui tam* statutes (collectively "the State False Claims Acts" or "State FCAs").  The false and fraudulent claims described herein are predicated on Defendant's statutory and regulatory violations of federal and state law, as well as federal and state program requirements, including but not limited to those related to Medicare and Medicaid.  These violations have led to the submission of false and fraudulent claims to the Government, as described more fully below, in violation of the Federal and State False Claims Acts.

## I.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.  The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

4.      This Court has personal jurisdiction over the Defendant because, among other things, Defendant transacts business in this District, and engaged in wrongdoing in this District.

5.      Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c), and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

6.      The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendant to conceal from the United States and the *Qui Tam* States their wrongdoing in connection with the allegations made herein.

## II.   PARTIES

### A.   RELATOR WENDY A. BAHNSEN

7.      Relator Wendy A. Bahnsen ("Relator Bahnsen") is a resident of Sylmar, California.  Relator Bahnsen was employed at Boston Scientific Neuromodulation Corporation ("BSNC"), a wholly owned subsidiary of Boston Scientific Corporation, from March 31, 2008 until October 15, 2009, when she was wrongfully terminated.

8.      From March 31, 2008 through January 2009, Relator Bahnsen was employed in BSNC's Customer Service department, until she was promoted to the Billing and Collections department.  In Customer Service, her primary task was to coordinate and resolve adverse issues patients were experiencing with BSNC's Precision Plus™ spinal cord stimulation system, such as technical or device problems, lead migration, skin irritation, burns and infection.

9.      Then from January 2009 through her date of termination, Relator Bahnsen was employed in BSNC's Billing and Collections department as a Reimbursement and Claims Management Specialist.  Her primary task was to submit claims for payment to Medicare, Medicaid and private insurance companies to obtain payment for BSNC's external medical equipment associated with BSNC's spinal cord stimulation medical devices.

10.     Relator Bahnsen is an experienced medical biller, having received her certification by the Medical Association of Billers in October 2004. The training she received to obtain her certification included Medicare billing regulations. Prior to her employment at BSNC, Relator Bahnsen was employed by various health care providers in billing and collections positions, including billing and collections involving Medicare, Medicaid and private insurance patients.

11.     Relator Bahnsen is the original source of the allegations in this First Amended Complaint against Defendant, and the allegations are not based upon publicly-disclosed information. She has provided the Government with information prior to the filing of this First Amended Complaint in accordance with 31 U.S.C. § 3730(b)(2). As a result of her lawful whistle-blowing and protected activities, Relator Bahnsen was unlawfully terminated from BSNC.

12.     Relator Bahnsen voluntarily provided the non-public information alleged herein to the Government prior to filing this action. Accordingly, Relator Bahnsen is an "original source" of the non-public information alleged in this First Amended Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

**B.     RELATOR CAROLINA H. FUENTES**

13.     Relator Carolina H. Fuentes ("Relator Fuentes") is a resident of Northridge, California. She was employed by Boston Scientific's Neuromodulation division from May 2005 through June 2010 until she was unlawfully terminated. She was employed as the Administrative Assistant to the BSNC's Vice President of Health Economics and Reimbursement, John Hernandez, from May 2005 through March 2008. Relator Fuentes was thereafter transferred to BSNC's Billing and Collections department in February 2009 until her unlawful termination.

4

14.     Relator Fuentes is the original source of the allegations in this First Amended Complaint, and the allegations are not based upon publicly-disclosed information.  She has provided the Government with information prior to the filing of this First Amended Complaint in accordance with 31 U.S.C. § 3730(b)(2).  As a result of her lawful whistle-blowing and protected activities, Relator Fuentes was unlawfully terminated from BSNC, her last being June 2, 2010.

15.     Relator Fuentes voluntarily provided the non-public information alleged herein to the Government prior to filing this action.  Accordingly, Relator Fuentes is an "original source" of the non-public information alleged in this First Amended Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

### C.     DEFENDANT BOSTON SCIENTIFIC NEUROMODULATION CORPORATION

16.     Defendant Boston Scientific Neuromodulation Corporation ("BSNC") is a wholly-owned subsidiary of Boston Scientific Corporation, and is based in Valencia, California. BSNC is incorporated under the laws of the State of Delaware.  Its parent company is Boston Scientific Corporation, a Delaware corporation with its principal corporate offices located in Natick, Massachusetts.  In June 2004, Boston Scientific Corporation acquired medical device manufacturer Advanced Bionics, Inc., which marketed cochlear implants, and in April 2004 obtained FDA approval to market a spinal cord stimulation system, the Precision Plus™ SCS System.  At all times material hereto BSNC marketed, sold, supplied and submitted claims for a range of medical devices and related equipment, including the Precision Plus™ SCS System, that were billed to Government Programs provided to patients in New Jersey and throughout the United States, including within this judicial district.

17.     As part of its operations, BSNC markets and supplies the Precision Plus™ Spinal Cord Stimulation ("SCS") system, approved by the FDA in 2004 for use in the treatment of intractable back pain.  The Precision Plus™ SCS System consists of both implanted and external

parts.  The implanted device consists of a small Implantable Pulse Generator ("IPG"), which sends electrical signals through accompanying "leads" which are surgically placed under a patient's skin along the spinal cord.  The external equipment includes (1) a wireless remote control, (the Precision SCS Remote, also known as the Programmer); (2) a cordless battery charger, (the Precision Charger); and (3) the Precision Adhesive Kit (26 double-sided adhesive patches used to attach the cordless charger to the patient's implant site).

18.     BSNC markets and supplies its Precision™ SCS Remote Model SC-5210.  The Precision Remote is an easy-to-use, cordless, handheld device which allows the patient to turn stimulation on and off, increase and decrease the level of stimulation, and target different pain areas using programs that are customized for use in different situations.  After implantation of the Precision™ IPG has been completed, the patient's SCS system is programmed to help relieve that patient's specific pain.  Once the system has been programmed, the patient will be able to use the remote to adjust stimulation.  The Precision Plus™ is the only SCS system to offer a cordless remote with a 24-inch communication range.  The Precision Remote can actually communicate with the stimulator within a range of up to 2 feet.  The Remote also indicates whether the IPG battery is low and in need or recharging.

19.     BSNC markets and supplies its Precision™ SCS Charger 2.0 Model SC-5312 (Precision Charger 2.0).  The Precision Charger 2.0 is a follow-on charger that replaced the Precision Charger 1.0, which was recalled due to defects which caused burns.  The Precision Charger is a cordless, lightweight charger which allows the patient to subcutaneously recharge his/her IPG battery while he/she continues to receive therapy.  A patient only needs to place the charger on top of the implant site using an adhesive patch or charging belt provided with the SCS system.  Without any wires or cords, this charger discreetly fits under the patient's clothing and

will allow the patient to charge at his/her convenience and while on the go.  For improved heat management, Precision Charger 2.0 is equipped with a thermistor (temperature sensing component), designed to activate/deactivate charging at a set temperature.  Since April 2004, patients reported receiving severe burns in the area of charging while using the Precision Charger 1.0.  Boston Scientific issued a recall of its Precision Charger 1.0 in September of 2008.

20.     BSNC markets and supplies its Precision™ Adhesive Kit Model SC-6350, which consists of 26 double-sided adhesive patches.  These adhesive patches are used to attach a cordless charger to the patient's implant site while their Implantable Pulse Generator ("IPG") battery is being recharged.  Without any wires or cords, this allows the patient to discreetly charge their IPG battery at their own convenience and while on the go.  These adhesive patches are a standard accessory for the maintenance of the SCS system.

21.     BSNC earns hundreds of millions of dollars from its neuromodulation business. For example, in 2009, BSNC's Neuromodulation products earned U.S. net sales of $271 million, as compared to $234 million in 2008.

22.     At all material times hereto, the BSNC Precision Plus™ Spinal Cord Stimulation device and its ancillary external equipment was paid or reimbursed by federal and state funded Government Programs, including Medicare and Medicaid (collectively, "Government Programs").

## III.    THE DEFENDANT'S FRAUDULENT BILLING SCHEMES

### A.     BSNC's Systematic Practice of Submitting False Claims

23.     As early as 2006, Defendant BSNC knowingly employed a systematic practice of committing fraud on the Government for purposes of obtaining Government reimbursement, by submitting thousands of falsified claims for payments to Medicare and Government Programs.

7

Some of the practices used by BSNC included:  (1) submitting claims without a Physician's Order supporting medical necessity, (2) changing the diagnosis codes provided by physicians to a different diagnosis code on Government claim forms, (3) making up diagnosis codes in the absence of a diagnosis code from a physician and inserting those made-up codes on Government claim forms, and (3) falsely certifying truthfulness and compliance with law on Government claim forms, including the CMS-1500 claim form.

24.     Defendant knew, or it was reasonably foreseeable, that its fraudulent billing practices would lead to the submission of fraudulent claims it submitted to Medicare directly or indirectly through Medicare contractors like Palmetto GBA, and paid by Government Programs. But for Defendant's fraudulent billing practices, and had the Government known that these claims were false, the fraudulent claims would not have been paid.

B.     BSNC'S BILLING AND COLLECTIONS BACKLOG

25.     The falsified claims that are the subject of this First Amended Complaint were submitted for payment for the external equipment related to BSNC's spinal cord neuro-stimulation medical device, the Precision Plus™ SCS system, approved by the FDA in 2004 for use in the treatment of intractable back pain.  The Precision Plus™ SCS system includes the core device that is implanted in the patient.  The external equipment includes battery chargers, remote controls that operate the system, and adhesives used by patients when remotely charging the battery.  These supplies were billed to the Government using the Healthcare Common Procedure Coding System ("HCPCS"), under the following HCPCS supply codes:  Chargers L8689, Remotes L8681, and Adhesives L9900.

26.     During the relevant time period, thousands of patients were using BSNC's Precision Plus™ SCS system.

8

27.     BSNC, as a Government-approved supplier of medical equipment, was responsible for responding to request for replacement external equipment, and staffed a billing and collections department that was responsible for processing the necessary documentation.  At all times relevant hereto, the BSNC billing and collections department was chronically backlogged.  Rather than hire additional staff or implement other methods to deal with the backlog, BSNC decided to fraudulently submit claims for payment that failed to document medical necessity, and ignored Government billing requirements.

28.     Much of the backlog stemmed from the lack of cooperation from busy physicians who failed to provide Physicians' Orders and/or diagnosis codes.  Over time, BSNC abandoned attempts to obtain information or require its billers to confirm documentation was ever received in BSNC's Web-Extender program.  Increasing pressure was placed on billers to process claims.

29.     BSNC ignored Government Program requirements that, as a condition of payment, BSNC obtain a valid Physician's Orders and diagnosis codes prior to submitting claims to the Government.

30.     BSNC supervisors and managers directed the unlawful billing practices described herein, as the backlog was a frequent topic of discussion in regular meetings at BSNC's Valencia, California office, with BSNC supervisors and managers present.

31.     In making up diagnosis codes and ignoring medical necessity documentation, BSNC substituted its own judgment for that of medical professionals.   As a result of these false claims, and the false certifications therein, CMS and/or Palmetto therefore paid claims that did not qualify as medically necessary.

32.     Most of the CMS-1500s claim forms were submitted to the Government without the necessary Physician's Orders, and/or with made-up general diagnosis codes, like ICD-9 diagnosis code 724.2.

33.     The prevalent use of the general diagnosis code 724.2 (lumbago-back pain) was financially advantageous to BSNC.  Since many of the expensive ($50,000 over course of use) spinal cord stimulation devices were used off-label, providing medical necessity evidence was problematic post-implant. For one example, many claims involve elderly patients who were likely prescribed the Precision SCS for urinary incontinence, an off-label use.  Using a clearly off-label diagnosis code on the claim form may have raised red flags with CMS.  Thus the use of a general code related to spinal, or back pain, that Boston Scientific knew would be least likely to generate any follow-up from CMS was to their financial advantage, and least likely to involve delays or denials of reimbursement.

34.     An example of the use of 724.2 is a July 9, 2009 physician's order for an adhesive kit for an already implanted spinal cord stimulation device, faxed and mailed to BSNC by Dr. Bratislav Velimirouic, of Bronson Neurological Services in Kalamazoo, Michigan.   Dr. Velimirouic did not include a diagnosis code on the form.  Nonetheless, the corresponding CMS-1500 included the diagnosis code 724.2.   The CMS-1500 was signed (and thus certified) as being accurate by Realtor Bahnsen, at the explicit direction of her supervisors.  The CMS-1500 was then faxed to CMS DME carrier Palmetto, in Augusta, Georgia for payment.

35.     Another example is Dr. Brian Murrell of Amarillo, Texas.  Dr. Murrell faxed into BSNC an order for replacement adhesive kit for an already implanted spinal cord stimulation device.  The February 10, 2009 order included multiple diagnosis codes, but not 724.2.  On two occasions, involving two shipments of these kits, the corresponding CMS-1500's, one dated

February 28, 2009 and March 14, 2009, the diagnosis codes were changed to 724.2.  Both falsified CMS-1500s were sent to Palmetto GBA in Augusta, Georgia for processing and payment.  The February 28, 2009 CMS-1500 reflected charges of $220.00.  The March 14, 2009 CMS-1500 reflected charges of $1,190.00.  Relators are in possession of additional examples supporting their claims and have provided them to the Government.

36.     BSNC tracks the payments it receives in connection with its falsified CMS-1500s.  BSNC operates a computer program, MediSoft, which tracks receipt of Medicare payments.  The MediSoft program reflects payments received for the above described falsified March 14, 2009 CMS-1500 claim form, on April 21, 2009, by check/EFT # 881293602.

**C.     Examples of False Claims Submitted to the Government**

37.     Below are four tables summarizing examples of the fraudulent claims BSNC submitted to the Government or Government Contractors such as Palmetto.  Each table includes information regarding the product description, the date and total amount BSNC billed Medicare for the product, the diagnosis code listed on the CMS-1500 form, the diagnosis code listed on the physician's order (if an order was ever obtained), and the name of the referring physician.  These tables are but snapshots of the thousands of false claims submitted or caused to be submitted by BSNC to Government Programs, which resulted in millions of dollars in payment.

38.     In Table 1 below, BSNC falsified claim forms by using different diagnosis codes on the CMS-1500 claim forms than the code given by the physician, or, if the physician did not provide a code, BSNC simply made one up.  In both situations, BSNC often used ICD-9 code 724.2, which is a general diagnosis code for "lumbago." These claims were submitted to the Government for payment and were paid.

| | | | | | Table 1 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Diagnosis Code(s) Differs from Physician Order | | |
| Date Billed (Box 31) | Product Description (Box 19) | HCPCS Code(s) Listed on CMS 1500 Form (Box 24D) | Diagnosis Code(s) Listed on CMS 1500 Form (Box 21) | Diagnosis Code(s) Listed on Physician Order | Name of Referring Physician (Box 17) | Amount Billed (Box 28) |
| 12/13/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.82* | Cong Yu, MD | $100.00 |
| 05/27/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.4 | 722.52* | Andrew Konen, MD | $110.00 |
| 10/10/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 724.4* 723.4* 729.5* 307.89* | Paul Grant, MD | $100.00 |
| 10/21/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.83* 721.4* | Roy Schmidt, MD | $100.00 |
| 09/03/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.83* 722.52* 724.4* 356.9* | Todd Sitzman, MD | $100.00 |
| 05/21/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | None Listed | Dennis Dobritt, DO | $175.00 |
| 04/25/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Bratislav Velimirouic, MD | $55.00 |
| 01/12/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.83 | Kuldip Deogun, MD | $65.00 |
| 08/19/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 338.4 | James C. Andrews, MD | $100.00 |
| 06/11/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 729.5 | Alfred Lonser, MD | $110.00 |
| 04/29/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.10 | 722.83 | Christopher J. Winfree, MD | $50.00 |
| 06/04/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.83* | Christopher J. Winfree, MD | $55.00 |
| 06/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 724.5 722.52 722.73 724.4 | Hussein Omar, MD | $110.00 |

12

| | | | | **Table 1** | | |
|---|---|---|---|---|---|---|
| | | | | **Diagnosis Code(s) Differs from Physician Order** | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Diagnosis Code(s) Listed on Physician Order** | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 08/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 724.5 722.52 722.73 724.4 | Hussein Omar, MD | $100.00 |
| 09/08/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | None Listed | P. Sebastian Thomas, MD | $100.00 |
| 09/05/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Richard Osenback | $50.00 |
| 04/30/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Not Listed | $110.00 |
| 11/07/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Stephen Lester, MD | $100.00 |
| 04/07/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | None Listed | Jason Rosenberg | $100.00 |
| 02/28/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 338.4 722.83 727.3 720.2 996.59 301.12 300.09 729.1 | Kyle Matsumura, MD | $220.00 |
| 03/14/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 724.2 | 338.4 722.83 727.3 720.2 996.59 301.12 300.09 729.1 | Kyle Matsumura, MD | $1190.00 |
| 08/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 733.82 | Jeff Garr, MD | $100.00 |
| 12/03/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 722.83 724.4 | 724.4 | Suneela Harsoor, MD | $1095.00 |
| 05/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 338.4 337.22 | Jawad Shah, MD | $110.00 |

| | | | | | Table 1 | | |
|---|---|---|---|---|---|---|---|
| | | | | **Diagnosis Code(s) Differs from Physician Order** | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Diagnosis Code(s) Listed on Physician Order** | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 06/02/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Adam Lewis, MD | $110.00 |
| 03/06/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 738.4 721.3 724.02 | T.J. Khaliqi, MD | $110.00 |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Sheldon Regenbaum, MD | $50.00 |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | Sheldon Regenbaum, MD | $100.00 |
| 09/23/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 338.4 724.4 | Richard Hurley, MD | $100.00 |
| 08/21/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 338.4 724.4 | Richard Hurley, MD | $100.00 |
| 08/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 724.02 722.52 722.73 | 724.4 724.02 | Michael Pylman, MD | $100.00 |
| 06/05/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 337.22 | Andre Rhea, MD | $110.00 |
| 04/29/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 724.4 723.4 729.5 307.89 | Paul Grant, MD | $100.00 |
| 09/08/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.83 724.4 | Ashley Classen, DO | $50.00 |
| 05/01/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 722.52 722.83 | Kam Sysodiya, MD | $100.00 |
| 09/11/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | 719.45 | Adam Arrendondo, MD | $100.00 |
| 10/06/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | None Listed | John Luckwitz, MD | $100.00 |

39.     In Table 2 below, BSNC falsified the CMS-1500 claim form by simply making

14

one up.   BSNC often used ICD-9 code 724.2, which is a general diagnosis code for "lumbago."

These claims were submitted to the Government for payment and were paid.

| | | | | | |
|---|---|---|---|---|---|
| **Table 2** | | | | | |
| **No Physician Order On File** | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 03/19/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 724.2 | Christopher Mocek, MD | $1095.00 |
| 01/28/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 724.2 | Powel A. Crosley, MD | $1095.00 |
| 03/12/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 724.2 | Jim Sheilds, MD | $1190.00 |
| 04/22/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.10 | Erich Wolf, MD | $20.00 |
| 01/19/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 A4595 | 724.10 | Jawad Shah, MD | $1150.00 |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 724.2 | Richard Ferro, MD | $50.00 |
| 03/14/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Ferro, MD | $110.00 |
| 05/12/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Jawad Shah, MD | $110.00 |
| 12/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kevin Drew, MD | $100.00 |
| 09/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Steven Rapp, MD | $110.00 |
| 09/05/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Steven Rapp, MD | $100.00 |
| 08/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Jeffrey Rosenberg, MD | $200.00 |
| 07/30/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 338.4 | Jawad Shah, MD | $100.00 |

15

| Table 2 | | | | | |
|---|---|---|---|---|---|
| No Physician Order On File | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 09/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 L8689 | 722.52 724.2 | Kevin Drew, MD | $2690.00 |
| 09/19/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Patrick Retterath, MD | $100.00 |
| 05/27/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.80 | Jon Obray, MD | $110.00 |
| 04/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | David McKellar, MD | $110.00 |
| 06/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Carroll McLeod, MD | $110.00 |
| 06/02/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kenneth Staggs, MD | $110.00 |
| 11/10/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Thomas Yearwood, MD | $100.00 |
| 10/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kenneth Staggs, MD | $50.00 |
| 08/19/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Todd Sitzman, MD | $100.00 |
| 09/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Carroll McLeod, MD | $110.00 |
| 08/21/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Dwayne E. Jones, MD | $50.00 |
| 11/04/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Peter Kosek, MD | $150.00 |
| 05/20/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | A4595 | 724.2 | Steven Frost, MD | $110.00 |
| 01/15/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | David A. Lindley, MD | $200.00 |
| 02/18/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | John Haine, MD | $110.00 |

16

| Table 2 | | | | | |
|---|---|---|---|---|---|
| No Physician Order On File | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 08/19/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Pouya Mohajer, MD | $50.00 |
| 08/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Pouya Mohajer, MD | $50.00 |
| 07/22/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.83 | Pouya Mohajer, MD | $50.00 |
| 09/08/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kyle Heron, MD | $50.00 |
| 08/18/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Patrick McNulty, MD | $100.00 |
| 02/28/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | James Robert Hay, MD | $110.00 |
| 08/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.83 | Michael Umanoff, MD | $100.00 |
| 09/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.83 | Michael Umanoff, MD | $110.00 |
| 04/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.00 | Ali I. Seckin, MD | $110.00 |
| 08/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Cesar Velarde, MD | $100.00 |
| 05/27/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Sheldon Regenbaum, MD | $50.00 |
| 02/25/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Allan Brook, MD | $110.00 |
| 10/06/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Gary Thomas, MD | $100.00 |
| 04/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Chaim Mandelbaum, MD | $165.00 |
| 06/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.83 | Mathu M. Ramasamy, MD | $220.00 |

17

| Table 2 | | | | | |
|---|---|---|---|---|---|
| No Physician Order On File | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Gordon Kuhar, MD | $50.00 |
| 04/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Andrew Davy, MD | $55.00 |
| 04/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Christopher J. Winfree, MD | $110.00 |
| 06/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Sung Chang, MD | $110.00 |
| 04/30/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | John Edmiston, MD | $110.00 |
| 03/05/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | James Skeen, MD | $110.00 |
| 07/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | James Skeen, MD | $100.00 |
| 06/11/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | James Skeen, MD | $100.00 |
| 06/11/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | James Skeen, MD | $50.00 |
| 11/10/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Crispino Santos, MD | $100.00 |
| 09/11/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Francisco Naveira, MD | $50.00 |
| 05/08/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Francisco Naveira, MD | $110.00 |
| 09/11/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Francisco Naveira, MD | $50.00 |
| 05/08/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Osenback | $110.00 |
| 12/22/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Duncan Scott, MD | $200.00 |

| Table 2 | | | | | |
|---|---|---|---|---|---|
| No Physician Order On File | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 07/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Rauck, MD | $110.00 |
| 09/10/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Michael Stretanski, MD | $165.00 |
| 08/13/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Michael Stretanski, MD | $100.00 |
| 05/09/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.83 | Salim Hayek, MD | $100.00 |
| 04/25/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Lawrence Zeff | $110.00 |
| 09/25/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 A9901 | 847.2 724.02 721.3 | Joshua Goldner, MD | $117.00 |
| 09/26/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Howard Seitzman, MD | $100.00 |
| 02/25/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Ahmed Amayem, MD | $55.00 |
| 09/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Stephen Lester, MD | $110.00 |
| 06/16/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Stephen Lester, MD | $110.00 |
| 09/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Ahmed Amayen, MD | $55.00 |
| 09/12/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Stephen Lester, MD | $100.00 |
| 09/03/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Gary Haas, MD | $100.00 |
| 05/13/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.52 721.0 720.2 721.3 | Peter Kosek, MD | $100.00 |
| 04/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Peter Kosek, MD | $110.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Table 2** | | | | | |
| **No Physician Order On File** | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 04/02/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Thomas Raley, MD | $165.00 |
| 04/23/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kalyan S. Krishnan, MD | $110.00 |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Ali El-Mohandes, MD | $100.00 |
| 04/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Ali El-Mohandes, MD | $110.00 |
| 03/17/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 | Yagnick Hemant, MD | $200.00 |
| 06/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Park, MD | $110.00 |
| 12/12/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Istavan Takacs, MD | $50.00 |
| 04/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Roy Schmidt | $110.00 |
| 11/10/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Roy Schmidt | $100.00 |
| 06/17/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | David Lutz, MD | $100.00 |
| 08/14/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | David Lutz, MD | $110.00 |
| 09/25/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.6 996.40 720.2 724.2 | Ralph Rashbaum, MD | $55.00 |
| 09/08/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | David Findlay, MD | $50.00 |
| 07/15/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.10 | Uday Doctor, MD | $100.00 |
| 03/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Jerry Wayne Lewis, MD | $110.00 |

20

| Table 2 | | | | | |
| --- | --- | --- | --- | --- | --- |
| No Physician Order On File | | | | | |
| Date Billed (Box 31) | Product Description (Box 19) | HCPCS Code(s) Listed on CMS 1500 Form (Box 24D) | Diagnosis Code(s) Listed on CMS 1500 Form (Box 21) | Name of Referring Physician (Box 17) | Amount Billed (Box 28) |
| 05/11/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Hurley, MD | $110.00 |
| 04/24/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Benjamin Cunningham, MD | $165.00 |
| 09/22/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Jon Paul Harmer, MD | $220.00 |
| 01/07/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Fernando Avila, MD | $100.00 |
| 06/04/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Steve Simmons, MD | $55.00 |
| 01/15/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Muhammad Khan, MD | $150.00 |
| 09/03/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | *Not Listed* | $50.00 |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 | Matthew Schocket, MD | $100.00 |
| 01/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | *Not Listed* | $200.00 |
| 09/03/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Chris Pratt, DO | $50.00 |
| 09/03/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | *Not Listed* | $100.00 |
| 12/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Faheem Sandhu, MD | $100.00 |
| 07/30/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 724.4 722.83 | Michael Decker, Md | $100.00 |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Cong Yu, MD | $100.00 |
| 01/21/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 722.83 724.4 | Beth Blankenship, PA | $100.00 |

21

| Table 2 | | | | | |
|---|---|---|---|---|---|
| No Physician Order On File | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 09/03/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | David Sibell, MD | $50.00 |
| 10/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | David Sibell, MD | $100.00 |
| 08/14/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | *Not Listed* | $110.00 |
| 04/29/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Arthur Watanabe, MD | $220.00 |
| 12/17/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Tom Yang, MD | $50.00 |
| 12/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Lennertz, MD | $50.00 |
| 02/28/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Mark Coleman, MD | $200.00 |
| 03/26/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | John H. Zolleriti, MD | $165.00 |

40.     In Table 3 below, prior to receiving a Physician's Order, BSNC shipped equipment to patients not knowing whether the equipment was medically necessary or reimbursable by the Government.

| Table 3 | | | | | | |
|---|---|---|---|---|---|---|
| Received Physician Order After Product Shipped to Patient | | | | | | |
| **Date Billed** (Box 31) | **Date Product Shipped** | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |

| Table 3 | | | | | | |
|---|---|---|---|---|---|---|
| **Received Physician Order After Product Shipped to Patient** | | | | | | |
| **Date Billed** (Box 31) | **Date Product Shipped** | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 01/23/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 338.4 | Eric Gabriel, MD | $1095.00 |
| 03/19/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 722.4 337.21 | Todd Sitzman, MD | $1190.00 |
| 02/18/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 724.4 724.3 353.1 | Kwadwo Gyarteng-Dakwa, MD | $1190.00 |
| 05/11/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 729.2 | Ming Cheng, MD | $515.00 |
| 03/19/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 729.2 | Ming Cheng, MD | $1095.00 |
| 09/03/08 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8689 | 729.2 | Ming Cheng, MD | $2425.00 |
| 03/04/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 338.4 724.4 | Sued Jaime, MD | $1100.00 |
| 09/10/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 338.4 724.4 722.80 | Michael Phillips, MD | $1095.00 |
| 07/22/08 | 05/27/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 338.4 724.2 | Jawad Shah, MD | $50.00 |
| 06/05/08 | 05/15/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | David Lutz, MD | $50.00 |
| 12/08/08 | 12/02/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Vinay Dalal, MD | $100.00 |

23

| Table 3 | | | | | | |
|---------|---|---|---|---|---|---|
| **Received Physician Order After Product Shipped to Patient** | | | | | | |
| **Date Billed** (Box 31) | **Date Product Shipped** | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 04/07/08 | 03/31/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 724.4 | Richard Hurley, MD | $100.00 |
| 05/01/08 | 04/24/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Richard Hurley, MD | $100.00 |
| 06/27/08 | 06/09/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 724.4 721.3 338.4 | William Robbins, DO | $100.00 |
| 07/09/08 | 06/04/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 | Stephen Lordon, MD | $100.00 |
| 06/10/08 | 06/02/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.9 724.02 729.5 719.4 | Richard Rosenthal, MD | $100.00 |
| 08/26/09 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 722.83 724.4 | Derek Frieden, MD | $1285.00 |
| 07/09/08 | 07/02/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 722.52 | Chris Merifield, MD | $165.00 |
| 06/04/09 | 06/01/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Christopher J. Winfree, MD | $55.00 |
| 06/29/09 | 06/26/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Hussein Omar, MD | $110.00 |
| 08/08/08 | 07/14/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Hussein Omar, MD | $100.00 |
| 09/08/09 | 01/17/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | P. Sebastian Thomas, MD | $100.00 |

24

| Table 3 | | | | | | |
|---|---|---|---|---|---|---|
| Received Physician Order After Product Shipped to Patient | | | | | | |
| **Date Billed** (Box 31) | **Date Product Shipped** | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 12/03/08 | -- | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L8681 | 722.83 | Suneela Harsoor, MD | $1095.00 |
| 05/22/09 | 05/19/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Jawad Shah, MD | $110.00 |
| 09/23/08 | 09/18/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Hurley, MD | $100.00 |
| 08/21/08 | 08/19/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Richard Hurley, MD | $100.00 |
| 08/08/08 | 07/28/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 724.02 722.52 722.73 | Michael Pylman, MD | $100.00 |
| 06/05/09 | 06/04/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Andre Rhea, MD | $110.00 |
| 09/08/09 | 07/21/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Ashley Classen, DO | $50.00 |
| 05/01/08 | 04/16/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kam Sysodiya, MD | $100.00 |
| 05/21/08 | 04/30/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | Dennis Dobritt, DO | $175.00 |
| 04/25/09 | 04/20/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Bratislav Velimirouic, MD | $55.00 |
| 01/12/09 | 01/06/09 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | Kuldip Deogun, MD | $65.00 |

| Table 3 | | | | | | |
|---|---|---|---|---|---|---|
| **Received Physician Order After Product Shipped to Patient** | | | | | | |
| **Date Billed** (Box 31) | **Date Product Shipped** | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 08/19/08 | 08/05/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.2 | James C. Andrews, MD | $100.00 |
| 04/29/08 | 04/21/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.10 | Christopher J. Winfree, MD | $50.00 |

41.     In Table 4 below, BSNC submitted claims to the Government prior to receiving a Physicians' Order, making up the diagnosis code, often using ICD-9 code 724.2, which is a general diagnosis code for "lumbago." These claims were submitted to the Government for payment and were paid.

| Table 4 | | | | | |
|---|---|---|---|---|---|
| **Billed Government Before Physician Order Received** | | | | | |
| **Date Billed** (Box 31) | **Product Description** (Box 19) | **HCPCS Code(s) Listed on CMS 1500 Form** (Box 24D) | **Diagnosis Code(s) Listed on CMS 1500 Form** (Box 21) | **Name of Referring Physician** (Box 17) | **Amount Billed** (Box 28) |
| 06/05/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 | David Lutz, MD | $50.00 |
| 04/07/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.02 724.4 | Richard Hurley, MD | $100.00 |
| 08/08/08 | Adhesive Kit for Implanted Spinal Cord Stimulator (SCS) | L9900 | 724.4 724.02 722.52 722.73 | Michael Pylman, MD | $100.00 |

### D.     BSNC's FALSE CERTIFICATIONS ON CMS-1500 CLAIM FORMS

42.     These example false claims in the above Tables and the thousands of others

26

submitted by BSNC were submitted on the CMS-1500 claim form.  As described herein, the

falsified CMS-1500 claims were additionally false and/or fraudulent because by signing the form

(see, e.g., Box 31), BSNC certified that the equipment was "medically indicated and necessary

for the health of the patient" (see reverse side of claim form), when in fact, BSNC often had no

knowledge whether the equipment was "medically indicated and necessary."

43.    Moreover, such claims were submitted for payment in violation of provisions of

the Medicare statute and regulations, which specify that services are only covered or

reimbursable when "medically indicated and necessary." *See*, *e.g.*, 42 U.S.C. § 1395y(a)(1)(A)

("nonpayment may be made [under the Medicare statute] for any expenses incurred for items or

services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or

injury").

44.    The submitted CMS 1500 claims forms sought (and have resulted in) payment of

Government monies to which BSNC is not entitled and that the Government paid, which

constitutes a violation of the False Claims Act.

45.    The falsified claims submitted for equipment are factually false claims and are not

reimbursable by Medicare.

46.    In addition to the other specific certifications and statements cited in this First

Amended Complaint, the reverse side of the CMS-1500 claim form, which is expressly

incorporated into the signature in Box 31, contains three explicit notices to BSNC:

> NOTICE: Any person who knowingly files a statement of claim
> containing any misrepresentation or any false, incomplete or
> misleading information may be guilty of a criminal act punishable
> under law and may be subject to civil penalties.
>
> NOTICE: Anyone who misrepresents or falsifies essential
> information to receive payment from Federal funds requested by
> this form may upon conviction be subject to fine and imprisonment

under applicable Federal laws.

NOTICE: this is to certify that the foregoing information is true,
accurate and complete. I understand that payment and satisfaction
of this claim will be from Federal and State funds, and that any false claims,
statements, or documents, or concealment of a material fact, may be prosecuted
under applicable Federal or State laws.

47.     As a result of the false claims BSNC submitted, it has falsely certified that the
"information is true, accurate and complete" in the CMS-1500.   Medicare Provider and Supplier
Enrollment Applications contain similar representations, and certifications and warnings.

48.     The related claims were submitted for payment in violation of the Medicare
statute and regulations which specify that services are only covered or reimbursable when
"medically indicated and necessary." "Since § 1395y(a)(1)(A) expressly prohibits payment if a
provider fails to comply with its terms, defendants' submission of the claim forms implicitly
certifies compliance with its provision."

49.     BSNC caused the claims described in this First Amended Complaint to be
submitted for Government reimbursement when Defendant knew (within the meaning of the
False Claims Act) that such claims were not eligible for reimbursement in whole or in part, and it
was a natural and foreseeable consequence of Defendant's fraud that Palmetto or other Medicare
Contractors would submit such claims to the Government.

50.     Government Health Care Program officials, their contractors, carriers,
intermediaries and agents, paid and approved claims for payment that should not have been paid
or approved.  Defendants, through the means described above, deliberately and intentionally
concealed material information, including the false or fraudulent nature of the claims, from
officials with Government Programs, their contractors, carriers, intermediaries and agents, in
order to induce payment of the false or fraudulent claims.

28

51.     Government Health Care Program officials and their contractors, carriers, intermediaries and agents, would not have paid the claims for BSNC's external equipment had they known the truth of BSNC systematic fraudulent claim submissions.

52.     Defendant's unlawful billing and promotion practices also involved the unlawful making of false records or statements for the purpose of getting the false records or statements to bring about the Government's payment of these false or fraudulent claims.

53.     Defendant's conduct had a material effect on Government Programs' decision to pay BSNC for medical devices and supplies.  Had Government Programs known that reimbursements were being made for BSNC's medical devices and supplies caused by Defendant's unlawful billing, the Government Programs would not have made such reimbursements.

54.     By reason of the above-described actions and the submission of claims that were false and/or fraudulent, BSNC inflicted significant damage to the integrity of Government Programs, as well as substantial financial losses in an amount to be determined.

## IV.    THE DEFENDANT'S CONCEALMENT OF DEFECTIVE EQUIPMENT AND PATIENT HARM FROM THE GOVERNMENT

55.     Defendant concealed and sought to minimize reports of patient harm, and failed to reimburse Government Programs for defective devices and equipment.

56.     From March 31, 2008 to January 2009, Relator Bahnsen was employed in BSNC's Customer Service Department.  As a Customer Service Representative, her primary task was to resolve patient issues relating to the Precision™ SCS System, such as technical or device problems, lead migration, skin irritation, infection and burns.  BSNC tracked these patient issues by entering Customer Service call notes with sales representatives and patients into BSNC's "Net Regulus" computer program.  These calls are recorded by BSNC.

57.     After Relator Bahnsen had begun working at BSNC, and, before she was assigned to Billing and Collections, she was assigned to the Customer Service Department.  In Customer Service, her primary task was to resolve issues patients were experiencing with BSNC's Precision Plus™ SCS system, such as technical or device problems, lead migration, skin irritation, infection and burns.

58.     Patients using the Precision SCS System encountered multiple problems with defective equipment.  These issues ranged from defects with the device itself, such as failure of the Precision SCS Implantable Pulse Generator ("IPG") to hold a charge, to patient injury relating to the system's external equipment, such as burns caused by the Precision SCS Charger 1.0 or 2.0.  An estimated 30%-40% of the patient calls were related to problems with the IPG, and of those, approximately 80% involved defects.

59.     Despite the problems associated with the Precision SCS System, BSNC trained and instructed its Customer Service representatives to avoid documenting patient adverse events or device problems in Net Regulus, which would then trigger reporting such adverse events to the FDA.  Relator Bahnsen was thus trained and instructed to carefully select descriptions of such adverse events to conceal the true state of facts from being reported to the FDA.  For example, Relator Bahnsen was told not to use the word "burn" in reporting patient complaints of being "burned" by the Precision SCS Charger.

60.     Notably, in September 2008, BSNC recalled its Precision SCS Charger 1.0 due to reports of second and third degree burns.  Publicity surrounding reports of burns associated with BSNC's supposedly improved Charger 2.0 could have led to another expensive recall.

61.     Moreover, BSNC policy was to deny free replacement devices, or reimbursing patients, and their insurers, including Government Programs, for defective devices and related

additional medical costs, except for those patients who complained the most.

A.    REGULATORY FRAMEWORK: MEDICAL DEVICE REPORTING

62.    The FDA is responsible for ensuring the safety and effectiveness of medical devices in the United States.  According to an October 2009 Office of the Inspector General ("OIG") Report entitled "Adverse Event Reporting for Medical Devices," adverse event reporting is a "critical component of the FDA's information-gathering process after it has approved or cleared a medical device for marketing."  Adverse event reporting provides the FDA with the most comprehensive source of information about the safety and effectiveness of medical devices and enables the FDA to take corrective action on problem devices in order to prevent injury or death by alerting the public when potentially hazardous devices are discovered.  *See Adverse Event Reporting for Medical Devices*, OIG Report (October 2009), available at http://oig.hhs.gov/oei/reports/oei-01-08-00110.pdf.

63.    Under the Federal Food, Drug, and Cosmetic Act, medical device manufacturers are required to notify the FDA when they become aware of a death or serious injury related to one of their devices or a device malfunction that would likely cause or contribute to a death or serious injury if that malfunction were to recur.  21 U.S.C. § 360i(1).  The regulation further defines a "serious injury" as an injury which (1) is life threatening; (2) results in permanent impairment of a body function or permanent damage to a body structure; or (3) necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure.  21 U.S.C. § 360i(a)(2).  Under this definition, "burns" related to the use of the Precision™ SCS System constitute a serious injury and thus, BSNC was and is obligated  to report such an event to the FDA.  By concealing such events to the FDA, the FDA's ability to protect the public from adverse events related to medical devices is obstructed and thus patients unknowingly continue to be at risk.

31

64.     In addition, pursuant to 21 C.F.R. 814.82(a) governing post-approval requirements, the FDA may impose even more stringent post-approval requirements in its device approval order or by regulation at the time of approval of the device.  Importantly here, in its April 27, 2004 FDA Approval Letter for the Precision SCS System, the FDA imposed strict adverse event reporting requirements in its "Conditions of Approval."   These events include "[a]ny adverse reaction, side effect, injury, toxicity, or sensitivity reaction . . . ."

### B.    RECALL OF PRECISION™ CHARGER 1.0

65.     A medical device firm may initiate a recall at any time. With the exception of recalls ordered under FDA's mandatory recall authority or pursuant to a court order, a recall is a voluntary action that takes place because manufacturers perceive that their device presents a risk of injury, or are otherwise defective. A recall may also follow notification of a problem by the FDA or a state agency.

66.     In late September 2008, BSNC initiated a voluntary recall of its Precision SCS Charger 1.0 devices for the Precision SCS System.  The recall was issued due to reports that the device was causing harm, such as burns, to the patient.  In a Field Safety Notice dated September 26, 2008, BSNC acknowledged that since April 2004, when the device was approved by the FDA, 27 of 8769 patients reported receiving second degree burns, and 3 of 8769 patients have reported receiving third degree burns in the area of charging while using the Precision Charger 1.0.

67.     Furthermore, the notice indicated that BSNC will replace, "at no cost" the Precision Charger 1.0 for the second generation Precision Charger 2.0.   The notice assured patients and health care professionals that the Precision Charger 1.0 can be safely used until replacement by following the instructions in the Patient System Handbook.  Shortly thereafter, BSNC began to receive a patient calls about burns related to the Chargers, both the recalled

charger, and the replacement Precision Charger 2.0.

68.     In order to avoid reporting such events to the FDA and issuing a second voluntary or rather a potentially FDA mandated recall, BSNC instructed is Customer Service representatives to avoid use of the term "burn" in their call notes because such a term constitutes a "serious injury" and thus is required by law to be reported to the FDA.  It was part of BSNC's profit maximizing scheme to direct its Customer Service representatives to create false records involving adverse events related to the Precision SCS System for the purpose of hiding such events to the FDA.

### C.     CONTINUING REPORTS OF PATIENT HARM AND DEFECTS

69.     Not only did BSNC conceal adverse events related to the use of its products to the FDA, but BSNC also continued to market its Charger 2.0 and seek reimbursement from Government Programs for the defective devices.

70.     After the recall of the Precision Charger 1.0, BSNC continued to receive reports of burns in connection with the Precision Charger 2.0.  For example, in an Issue Detail Report received on September 15, 2009, one such patient reported experiencing multiple burns in the area of charging related to the use of Precision™ Charger 2.0.  The patient complained that she "gets burned about 3 or 4 times when she goes to charge" and that there is "redness in that area the size of the charger and is painful to the touch."  The report further states that the patient uses adhesive patches to charge, does not apply the charger directly to the skin, does not cover the charger, and does not charge while sleeping which indicates that the patient properly follows the product's instructions for use and thus, the burn was caused not by patient negligence but rather as a result of the device itself.

71.     The Manager of BSNC's Customer Service Department at the time responded to the report by denying replacement of the charger, concluding that the "[patient] is out of

warranty and replacement would need to be purchased through insurance." Ultimately, the patient's insurance company denied replacement of the charger because the "codes that were sent in [were] incorrect and the claim need[ed] to be re-submitted."

72.     Not only did BSNC deny reimbursement of the defective device, but also recommended the device be "explanted" which involved a costly surgical procedure. The adverse event was a result of a defect in either or both the IPG (failure to hold a charge) or the Charger 2.0. Yet by denying reimbursement and recommending an external explant, the patient and thus the patient's insurance provider, most likely Medicare, would incur a substantial amount of medical costs associated with the surgical explantation.

73.     As alleged herein, BSNC knowingly concealed ongoing adverse events related to its Precision Chargers to the FDA, continued to market these products, and avoided footing the bill for costly replacements. By engaging in these acts, BSNC failed to comply with various laws and regulations, including FDA's Conditions of Approval, placing patients at risk of harm and driving up Government Program costs.

74.     In addition to burns, patients using the Precision Plus™ SCS system encountered multiple other problems with defective equipment. Patient calls to Customer Service also involved defects with the implanted device itself or with a problem with the device "leads." Notwithstanding the facts that it knew of widespread device and equipment problems, it was BSNC's policy to only reimburse Government Programs for defective devices when patients or providers complained.

75.     Despite the problems associated with the SCS system, which included defects related to the IPG, chargers, remotes and leads, BSNC trained and instructed its Customer Service employees to be careful when documenting patient adverse events or device problems in

34

Net Regulus, because, if the employees wrote too much, or used certain terms, such as "burn," such an the adverse event, would need to be reported to the FDA.  BSNC conveyed to their employees its desire to avoid any such reporting to the FDA.

76.     Relator Bahnsen was thus trained and instructed to carefully select descriptions of adverse health events to conceal the true state of facts from being reported to the FDA.  Such manipulation of the Net Regulus call notes included falsifying dates of certain events.

77.     Generally, no payments may be made under Medicare for expenses incurred for items and services that are not "reasonable and necessary" for the diagnosis and treatment of an illness. 42 U.S.C. § 1395y(a)(1)(A).  Reimbursement for defective equipment is not reasonable and necessary.

78.     The late September 2008 "Field Safety Notice" and "Urgent Medical Device Recall" on all first generation Precision Charger 1.0 devices (model number SC-5300 / UPN M365SC53000) for the Precision™ Spinal Cord Stimulator System involved 6,549 units in commerce.  This action did not affect any implanted components, such as the IPG, leads or extensions.  The recall was issued due to reports of second and third degree burns while using the Precision Charger 1.0.  The burns occurred in the area of charging, typically at the abdominal, upper buttock, and less frequently in the subclavicular area.  The notice cited reports of only 27 out of 8,769 patients receiving second degree burns, and 3 out the 8,769 receiving third degree burns.

79.     Furthermore, the notice indicated that BSNC will replace, "at no cost" the Precision Charger 1.0 for the second generation Precision Charger 2.0.   The notice assured patients and health care professionals that the Precision Charger 1.0 can be safely used until replacement by following the instructions in the Patient System Handbook.  Shortly thereafter,

BSNC began to receive a patient calls about burns related to both the recalled charger, and the replacement Precision Charger 2.0.

80.     BSNC's Field Safety Notice vastly understated the number of patients who received burns, which was the result of BSNC's policy of concealing the true nature of patient harm caused by its product defects.

81.     Furthermore, BSNC issued field safety notification letters to health care professionals on September 26, 2008.  These letters acknowledged BSNC's voluntary recall of all first generation chargers and ensured that, at no cost, BSNC would replace this Precision Charger 1.0 model for a new generation Precision 2.0, which featured a temperature limiter for improved temperature management.  The letters also advised that patients can safely use the Precision Charger 1.0 until they obtain a replacement Precision Charger 2.0.

82.     After these letters were sent to patients, BSNC began to receive a significant increase in the number of patients calling about burns related to the charger, both the recalled 1.0 and the replacement 2.0.  One such example is a complaint received in September 2009, from patient Jane Doe, who could not properly operate her 2.0 charger, and had experienced multiple burns.  The complaint was entered into BSNC's system as "Record No. 369,126" on September 15, 2009.  The Detail Report contains a summary of BSNC's response, which ultimately was a denial of a replacement charger.  The patient was advised to go through her insurance company.  This patient's insurance company denied the claim because incorrect codes were submitted and the claim needed to be re-submitted.

83.     After BSNC learned of the charger defects and after it implemented corrective manufacturing actions to the charger, BSNC continued to receive reports of patient harm such as

burns in connection with the Precision Charger 2.0 - like the burn complaint made by patient Jane Doe.

84.     As described above, BSNC took steps to conceal the continuing complaints to the FDA and health care providers who may have had defective versions of the Precision Chargers. BSNC thus failed to evaluate complaints properly to determine whether they should be reported to the FDA, and did not conduct adequate investigations of complaints.

85.     At all times when comparable charging devices without a defect were available, it was thus not reasonable and necessary for the devices with defects to be implanted in patients, or external equipment such as the Precision Charger to be provided to patients.   As such, the Precision Charger's defects rendered it not "reasonable and necessary" for the treatment of an illness. 42 U.S.C. § 1395y(a)(1)(A).

86.     It was reasonably foreseeable that the defective versions of the chargers would continue to be used for Medicare and Government Program patients.

87.     As the direct, proximate, and foreseeable result of BSNC's course of conduct, as set forth above and herein, BSNC knowingly caused false or fraudulent claims for defective equipment, or replacement equipment (including related surgeries and medical care) which should have been covered by BSNC under express or implied warranties, to be submitted to Medicare and other Government Programs for its Precision Plus™ Spinal Cord Stimulation System.

## V.     BSNC'S FRAUDULENT KICKBACK SCHEMES

88.     Defendant circumvented FDA Guidelines by its kickback program which promoted the Precision Plus™ System beyond FDA-approved indications, and the provision of free services and other inducements to physicians.

89.     The FDA approves products for specific indications, which are stated in the label. When a medical device is approved for one purpose or indication and used outside this approved purpose, that use is deemed "off label." Off-label promotion involves disseminating information about product uses not approved by the FDA.

90.     The Precision Plus™ is approved by the FDA as an aid in the management of chronic intractable pain of the trunk and/or limbs, including unilateral or bilateral pain associated with the following: failed back surgery syndrome, intractable low back pain and leg pain.

91.     The cost of the Precision Plus™ Spinal Cord Stimulation System, including ancillary equipment such as the battery pack, leads and remote control, is significant – in the range of $30,000.

92.     BSNC submitted or caused the submission of false and fraudulent bills to Government Programs for its Precision Plus™ SCS equipment that was unlawfully promoted and prescribed for off-label uses, which were then paid by Government Programs.

93.     For example, Relators attended mandatory meetings at BSNC's Valencia, California headquarters where annual off-label presentations were given.  These presentations began at least as early as 2005, and annually through at least 2008.  These mandatory meetings for BSNC employees were attended by BSNC senior management, including Michael Onuscheck, BSNC's Vice President of Sales and Marketing for Boston Scientific's Pain Management business (who led the commercial launch of the Precision™ Spinal Cord Stimulation System), John Hernandez, Wendy Chan, Richard Garcia, BSNC staff, patient speakers, physician speakers, sales representatives as well as reimbursement specialists.

94.     BSNC also paid speakers to promote the Precision Plus™ system for off-label uses.  For example, BSNC paid Michael Roman ("Roman") to be a spokesperson for the

Precision Plus™ System, and to speak nationally on the use of the Precision Plus™ System for his phantom leg pain.   Roman is a partial amputee, and experienced pain associated with phantom limb pain, a use of the Precision Plus™ not approved by the FDA.

95.     Roman is a Formula race car driver, whose phantom limb pain reportedly ended in 2005, when a pain specialist recommended the Precision Plus™.   His car racing team is sponsored by Boston Scientific.

96.     BSNC employees, including Relators, as well as sales representatives, are required to and did meet with Roman periodically at BSNC's Valencia, California headquarters. At these meetings, Roman discusses the benefits he has experienced using BSNC's Precision Plus™ system for phantom limb pain, an unapproved use.

97.     Roman speaks around the country as the spokesperson for the Precision Plus™. Example of Roman's speaking engagements include:   (1) in July 2009, Dr. Magdalena Kerschner, director for the Center for Interventional Pain Management at Brown County General Hospital in Georgetown, Ohio, invited Roman to a "Rein In Pain" 5 Mile Awareness Walk in Cincinnati, Ohio to promote pain awareness.  Roman's promotion, and his use of the Precision Plus™ for phantom limb pain, was also prominently publicized on the Brown County General Hospital website; (2) Roman spoke on August 28, 2010 at the Amputee Coalition of America's National Conference in Irvine, California, sponsored by BSNC; (3) a May 11, 2010 Trinity Regional Medical Center Pain Management Center Forum on Pain, located in Fort Dodge, Iowa, sponsored by BSNC, for health care providers on treatment options for chronic pain; and (4) a September 2009 American Society for Pain Management Nursing conference in Jacksonville, Florida as a keynote speaker.  The conference was sponsored in part by Boston Scientific.

98.     As an adjunct to and to facilitate the success of its off-label marketing program, BSNC provided physicians free reimbursement and prior authorization services to physicians to steer Government Program payments for on and off-label uses of the Precision Plus™ system. The nature of these services are of the type that physicians would otherwise provide and pay for themselves, but for BSNC's free reimbursement and prior authorization program.    These services were provided to physicians to induce the prescribing of the expensive Precision Plus™ system paid for by Government Programs.

99.     The payment of kickbacks to physicians to induce them to utilize products or services, by a person who seeks reimbursement from Government Programs, or who causes another to do so, while certifying or impliedly certifying compliance with the Medicare Fraud & Abuse/Anti-Kickback Statute, the Food, Drug and Cosmetics Act, or while causing another to do so, constitutes a violation of the FCA and State law counterparts.

100.    To participate in the Medicare program, DME suppliers enter into agreements with CMS in which the supplier agrees to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare.  For DME suppliers like BSNC, a CMS Form 855S (or equivalent) is completed.  At all relevant times, BSNC was a certified supplier which applied for Medicare enrollment by completing a Form CMS-855.  The CMS-855 contains a certification of compliance with law, which further notified BSNC that lawful compliance is a condition of payment by Medicare:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

40

101.   As described in this First Amended Complaint, BSNC falsely certified its compliance with law, and at that time and continuing into the future, BSNC committed the fraudulent acts, including payment of kickbacks, alleged herein.   As such, all payments made from Medicare were wrongly paid.

102.   The U.S. Department of Health and Human Services Office of the Inspector General ("OIG") has offered its insight regarding the provision of free reimbursement support services, suggesting that such services are highly susceptible to fraud and abuse in Federal Programs, including Medicare and Medicaid.   On October 3, 2006, the OIG issued an advisory opinion in response to an inquiry regarding a proposed arrangement for a DME supplier to offer free reimbursement consulting services to some of its customers.   *See* OIG-HHS, Adv. Op. No. 06-16 (issued October 3, 2006).   The referenced "reimbursement consulting services" included: (1) general claims submission information, such as advice on how to code products; (2) reviewing claims; (3) helping to appeal denied claims; and (4) providing assistance related to medical justification for receiving particular products.   The OIG determined that these reimbursement services constituted remuneration and that because the DME Suppliers were "in a position to generate Federal health care program business" for customers, offering such free services "clearly" implicated the Federal Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b(b). The OIG also concluded that any assistance "securing Federal reimbursement for individual beneficiaries to receive particular products could cause beneficiaries to receive greater quantities of, or more expensive" product than they actually require. In addition, such reimbursement services would tend to provide a financial incentive to steer customers to purchase the supplier's products, "even if products from other manufacturers were less expensive or more appropriate."

103.    Similar to the scenario outlined in the advisory opinion, BSNC's free reimbursement and prior authorization services, as the OIG concludes, was simply a "vehicle to pay unlawful kickbacks" to BSNC's customers in an effort to increase sales and thus increase payments from Government Programs.

104.    In addition, the OIG issued a second advisory opinion in which the OIG determined that any services, including pre-authorization services, which save a physician's office staff time, result in a realization of savings, or were designed to refer or induce the purchase of the manufacturer's products could constitute unlawful remuneration and thus implicate the anti-kickback statute.  *See* OIG-HHS, Adv. Op. No. 10-04 (issued April 30, 2010).

105.    BSNC's free reimbursement services ultimately influenced physicians' prescribing decisions by making it easier and less burdensome for a physician to prescribe the very expensive Precision Plus™ System on, and off-label, and obtain reimbursement from Government Programs.

106.    As a result of BSNC's inducements to prescribe its Precision Plus™ system, claims tainted by illegal kickbacks were submitted to Government Programs for off-label and on-label uses of BSNC's Precision Plus™ System, rendering these claims not eligible for payment.

## VI.    DEFENDANT DEFRAUDED GOVERNMENT PROGRAMS, INCLUDING MEDICARE AND MEDICAID

### A.    Medicare

107.    Medicare covers the cost for Durable Medical Equipment ("DME"), including the Precision Plus™ Spinal Cord System marketed and sold by Defendant, as well as the associated implantation procedure in instances for patients with certifiable chronic intractable pain.

108.    Recognizing the substantial expense associated with DME, Congress has expressly conditioned payment for Medicare items and services on a physician's Order

("Physicians' Order"), (sometimes referred to as a Certificate of Medical Necessity, or Letter of Medical Necessity), signed by a physician certifying to the medical necessity for any service or supply for which claims are submitted to and paid for by the Medicare program.   These Physicians' Orders provide the documentation requirements to substantiate that the physician has reviewed the patient's condition and has determined that certain equipment and supplies are medically necessary.

109.   Some suppliers of equipment and supplies may supply their own forms to evidence the medical necessity documentation of a Physicians' Order.  For example, BSNC has provided physicians with its own "Order" forms for the medical supplies which are the subject of this First Amended Complaint.   This form is entitled "Healthcare Provider's Order For Precision™ SCS Supplies."

110.   The need for a Physicians' Order was discussed at BSNC's senior management levels.   For example, the April 24, 2007, BSNC Reimbursement Compliance Subcommittee meeting minutes reflect that a review was discussed of healthcare providers order for supplies form.  John Hernandez, Vice President of Health Economics and Reimbursement, acknowledged the need to obtain a letter of medical necessity.  The minutes reflect that also in attendance were most of BSNC management, including Michael Onuscheck, who was Vice President of Sales and Marketing for Boston Scientific's Pain Management business (and who helped launch the spinal cord stimulation business at Boston Scientific).

111.   Failure to obtain the requisite physician signature on the Physicians' Order prior to submitting a claim for Medicare reimbursement subjects a supplier to civil liability under the Social Security Act (the "Act").   The Act provides that "any supplier of medical equipment and supplies who knowingly and willfully distributes a Physicians' Order in violation of clause (i) or

43

fails to provide the information required under clause (ii) is subject to a civil money penalty in an amount not to exceed $1,000 for each such certificate of medical necessity so distributed."  42 U.S.C. § 1395y(j)(2)(A)(iii).  These penalties are cumulative to the False Claims Act penalties. Failure to comply with Medicare regulations subjects suppliers to repayment of all amounts received from Medicare based on the improper billing.

112.   Along with a Physicians' Order, medical suppliers like BSNC are required to include on a claim form the treating physicians' diagnosis, expressed as codes, which are developed by the Department of Health and Human Services to be used for reporting diagnoses on health care transactions.  Diagnosis codes are the numeric or alphanumeric designations on a Medicare claim form that identifies the beneficiary's ailment.  Diagnosis codes have been required for supplier claims since at least 2003 when the Centers for Medicare and Medicaid Services ("CMS") published a bulletin on June 13, 2003, entitled "Establishing New Requirements for ICD-9-CM Coding on Claims Submitted to Medicare Carriers – Increased Role for Physicians/Practitioners."  These codes are commonly referred to as "ICD-9" codes.

113.   Proper coding is necessary on Medicare claims because codes are generally used to assist in determining coverage and payment amounts.   "Code Jamming" involves the falsifying or "jamming" of fake diagnostic codes to increase reimbursements from Medicare and other government programs.  Failure to submit a proper diagnosis code can result in Medicare rejecting a supplier's submission for payment.  Here, as is more fully described below, BSNC's policy involved a form of code jamming – inserting codes that ensure reimbursement, for example ICD-9 code 724.2, on thousands of claim forms.

114.   DME suppliers are provided guidance on ensuring complaint claim submission and ensuring proper coding.  BSNC submitted its claims for reimbursement to Medicare Carrier

Palmetto GBA.  Palmetto itself cautions suppliers to use the appropriate CPT or HCPCS code, and that the next most important element of coding is to accurately report the patient's diagnosis, symptom or complaint coded to the highest level of specificity.

115.     Palmetto further cautions that providers or suppliers who  knowingly file a false or fraudulent claim for payment to the government, knowingly using a false record or statement to obtain payment on a false or fraudulent claim paid by the government, or conspiring to defraud the government by getting a false or fraudulent claim allowed or paid, is a violation of the False Claims Act.

116.     Between 2006 and until at least 2010, BSNC made or caused to be made thousands of false claims to Medicare, including false claims on the Medicare Form CMS-1500, to unlawfully induce obtain payment from Medicare, and for dual-eligible patients, Medicaid-funded co-payments.

117.     The CMS-1500s contain explicit terms which require certifications of compliance with Medicare and other Government Program requirements.  The Defendant's submission of falsified CMS-1500's subjects Defendant to criminal prosecution and civil penalties.

118.     The claims submitted to Medicare by suppliers like BSNC for DME are handled by DME Regional Carriers, who are approved by the Centers for Medicare and Medicaid Services ("CMS").  In this case, Palmetto GBA, LLC ("Palmetto") serves as the regional carrier that administers the transaction processing for implanted DME (including those marketed by BSNC).  DME suppliers (e.g., BSNC) are required to provide DME Regional Carriers (e.g., Palmetto) with the proper documentation in order to receive reimbursement from Medicare. Included among this information are Physicians' Orders and the proper diagnosis codes

119.    DME Regional Carriers like Palmetto pay suppliers like BSNC, and in turn present claims for reimbursement to CMS for reimbursement.   As described in this First Amended Complaint, BSNC's fraudulent schemes caused Palmetto to submit thousands of false claims to the Government for payment.

## B.    OIG Promulgates DME Billing Guidance On Point

120.    The U.S. Department of Health and Human Services Office of Inspector General has issued guidance to industry which describes the types of fraudulent billing DME suppliers like Defendant are required to avoid.

121.    For example, In January 1999, the U.S. Department of Health and Human Services Office of Inspector General ("OIG") issued a fraud alert addressing its concern that physicians were not appreciating the legal and programmatic significance of certifications they make in connection with the ordering of certain items and services for their Medicare patients. This fraud alert related directly to DME claims.   The alert also provided specific examples of inappropriate certifications which would constitute fraud.

122.    In the section entitled "Improper Physician Certification Foster Fraud," the OIG explained that "unscrupulous" suppliers may be tempted to steer physicians into signing or authorizing improper Orders.   The OIG recognized that these types of suppliers complete the order themselves and then present the documentation to the physicians, who in many cases then sign the forms without verifying the actual need for the items.   The OIG identifies these forms as inappropriate certifications, subjecting the medical suppliers (and sometimes the physician) who submit them to criminal and civil penalties.

123.    In July 2009, the OIG published a formal guidance document entitled "Compliance Program Guidance for the Durable Medical Equipment, Prosthetics, Orthotics and

46

Supply Industry," which was designed to "engage the health care community in combating fraud and abuse."   In the guidance document, the OIG identified several risk areas for DME suppliers, including, *inter alia*, (1) falsifying information on the claim forms, Physicians' Orders and accompanying documentation; (2) completing portions of Physicians' Orders reserved only for the treating physician or other authorized person; (3) altering medical records; and (4) manipulating the patient's diagnosis in an attempt to receive improper payment.

124.   Here, BSNC's fraudulent billing fits squarely within the types of improper and unlawful billing the OIG counsels DME suppliers are required to avoid.

125.   As a Medicare supplier, BSNC was charged with knowledge of the Medicare regulations and with the understanding that Medicare would not provide reimbursement for services that are not properly documented.

126.   Defendant's fraudulent billing practices also resulted in numerous false certifications to the Government.   As a condition of receiving payment, DME suppliers like BSNC are required to certify compliance with the CMS rules and regulations, including the express certification contained in the CMS-1500 form.   BSNC's non-compliance as alleged by Relators renders each and every fraudulent CMS-1500 claim false.

127.   The Medicare Program ("Medicare") does not provide limitless funds for DME suppliers like BSNC to change the rules to accommodate their own business issues, like clearing billing backlogs.   Medicare is a taxpayer-funded federal program that provides free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.   The Medicare Part B program is a federally-funded supplemental insurance program that provides supplementary Medicare insurance benefits for individuals aged sixty-five or older and certain individuals who are disabled.   The Medicare Part B program pays for medical services, including

DME, for beneficiaries.  Each Medicare Part B program has a "Carrier" which contracts with CMS to process valid claims.  BSNC regularly submitted falsified or otherwise ineligible claim for payment to DME carrier Palmetto GBA, which serves suppliers of Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) like BSNC.

128.    Medicare requires that the provider of services or supplier of items certify that the services rendered or items delivered are medically necessary and are furnished by that provider or supplier.  Providers participating in the Medicare program must certify in writing that they will be responsible for the accuracy of all claims submitted by themselves, their employees or their agents, and that all claims submitted under their provider numbers will be accurate, complete and truthful.  The bottom of the CMS-1500 form explicitly states that it is a crime to submit any false claims or statements, or to conceal a material fact, in relation to the submission of a claim.

129.    CMS expects that providers of medical services, supplies and equipment conduct themselves honestly and in accordance with Medicare requirements.  The Medicare Program Integrity Manual, CMS Publication 100-08 addresses provider integrity and compliance requirements, including the submission of truthful, accurate claims.

130.    As described in this First Amended Complaint, from 2006 through 2010, in the District of New Jersey, and elsewhere, Defendant in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare.   That is, the Defendant submitted

and caused the submission of false and fraudulent claims to Medicare, seeking reimbursement for the cost of its Precision Plus equipment.

131.    At all relevant times hereto, CMS contracted with Palmetto GBA to administer and pay claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies maintained by the federal government. CMS contracted with Palmetto GBA, LLC (Palmetto) to, among other things, process and pay claims submitted by BSNC.

132.    Palmetto processes millions of claims, and relies on medical suppliers like BSNC to conduct its business honestly.  For example, in 2005 Palmetto processed 117 million claims, in 2006 Palmetto processed 117 million claims, in 2007 Palmetto processed 98 million claims, in 2008 Palmetto processed 120 million claims, in 2009 Palmetto processed 181 million claims and in 2010, Palmetto processed more than 179 million Medicare claims.  The sheer volume of claims processed by Palmetto is dependent upon Medicare providers' integrity.

133.    As described in this First Amended Complaint, BSNC has submitted and/or caused the submission of false claims, and/or created false records to get claims paid by Government Programs, to BSNC benefit, and at the expense of and harming Government Programs.

### C.  MEDICAID

134.    BSNC's fraudulent billing practices also impacted the Medicaid program. Medicare is a federally funded program that provides health care benefits for persons aged 65 and older, persons under age 65 with certain disabilities, and people of all ages with end-stage renal disease.  However, Medicare does not offer coverage for all health care costs.  Medicare beneficiaries must pay the difference between what Medicare pays and what a health care provider charges.  This is referred to as cost-sharing.  Cost-sharing involves provisions of an

insurance policy that require the beneficiary to pay some portion of the covered expenses. Deductibles, coinsurance and copayments are all examples of cost-sharing for which a Medicare beneficiary is liable to pay.  However, many low-income Medicare beneficiaries cannot afford these out-of-pocket expenses, and in some instances, Medicaid will help cover these costs.

135.   Low income individuals who are entitled to Medicare benefits are eligible for some form of Medicaid benefit are often referred to as "dual eligibles." *See Medicaid Coverage of Medicare Beneficiaries (Dual Eligibles) At a Glance, C*MS Fact Sheet *(*December 2010), available at http://www.cms.gov/MLNProducts/downloads/Medicare_Beneficiaries_Dual_ Eligibles_At_a_Glance.pdf.   In 2007, nearly 9 million individuals were dually eligible for Medicaid and Medicare programs.  Of these, 6.9 million were "full" dual eligibles, meaning they received full Medicaid benefits as well as Medicaid assistance with Medicare premiums and cost-sharing.  The remaining dual eligibles, "partial" dual eligibles, received Medicaid assistance only with Medicare premiums and other out-of-pocket costs.  *See Dual Eligibles: Medicaid's Role for Low-Income Medicare Beneficiaries,* Kaiser Commission on Medicaid and the Uninsured (May 2011), available at http://www.kff.org/medicaid/upload/4091-08.pdf.

136.   Dual eligibles are among the poorest and sickest individuals covered by either Medicare or Medicaid programs, and thus account for a disproportionate share of Medicare and Medicaid spending.  In 2007, dual eligibles comprised 21% of Medicare beneficiaries but 36% of all Medicare spending.  Likewise, dual eligibles comprised 15% of all Medicaid beneficiaries but 39% of Medicaid spending.  As a result, dual eligibles are of great importance to federal and state governments because they account for nearly 40% of all Medicare and Medicaid expenditures for medical services.

137.    Medicaid is the secondary insurance provider for many patients implanted with the Precision Plus system.  For these dual-eligibles, Medicaid typically covers the cost-sharing portion for Medicare covered services.  Medicare rarely pays for a beneficiary's entire bill. Generally, Medicare pays 80% of the Medicare allowed or approved amount and the remaining 20%, the Medicare coinsurance, is paid for by Medicaid.

138.    The majority of claims BSNC submitted to Medicare for reimbursement were for dual eligible beneficiaries.

139.    Although Medicaid coverage and eligibility varies by state, the California Medicaid program, known as Medi-Cal, illustrates the general paradigm for the relationship between Medicare and most Medicaid state programs.  Medi-Cal helps pay the cost-sharing for Medicare covered benefits and services, and for certain care not covered by Medicare. According to Medi-Cal Provider Manuals, which can be located on the Department of Healthcare Services' Medi-Cal website, claims for Medicare covered benefits and services must first be billed to the appropriate Medicare carrier (*e.g.*, Palmetto GBA) for processing of Medicare benefits.  If Medicare approves the claim, it must then be billed to Medi-Cal as a "crossover claim."

140.    Durable medical equipment ("DME") and other medical services and supplies, such as BSNC's Precision™ SCS System and related equipment, are covered under Medicare Part B.  In California, service providers (*i.e.*, BSNC) directly submit Part B claims electronically to the appropriate Medicare carrier (*i.e.*, Palmetto GBA) for reimbursement of the Medicare covered equipment or supplies.  Medicare covers 80% of the Medicare allowed amount and then forwards the crossover claim to Medicaid for the remaining 20%.

141.   BSNC billed for a range of medical devices and related equipment to Medicare, including ancillary equipment and supplies relating to the Precision™ SCS System (*i.e.*, the Precision™ SCS Remote Control, Charger, or Adhesive Kit).  These claims were electronically submitted to Palmetto GBA by BSNC for Medicare processing and if approved, were subsequently forwarded to Medi-Cal as a crossover claim.  As a result, BSNC caused false or fraudulent claims to be submitted not only to Medicare, but also to Medicaid state programs, such as Medi-Cal for payment.

142.   Below is a list of CMS-1500 forms BSNC submitted to Medicare and a brief description of each claim's connection to BSNC's fraudulent billing scheme and Medicaid state programs.  The claim forms are listed in chronological order:

1.   A CMS-1500 form dated August 8, 2008, reflects charges of $100.00 to Medicare for a replacement adhesive kit for an already implanted spinal cord stimulation device.  A New York state Medicaid program, "MEDICAID NY CSC," is listed as the beneficiary's secondary insurance provider in Box 9d of the claim form. The Physicians' Order corresponding to this CMS-1500, signed by Dr. Hussein Omar on July 24, 2008, includes four diagnosis codes, none of which were 724.2, yet the code 724.2 is the only diagnosis code appearing on the claim form.

2.   A CMS-1500 form dated October 14, 2008, reflects charges of $50.00 to Medicare for a replacement adhesive kit.  A Mississippi state Medicaid program, "MEDICAID MISSISSIPPI," is listed as the beneficiary's secondary insurance provider in Box 9d.  The code 724.2 appears on the CMS-1500 form although BSNC was never in possession of a Physicians' Order for the claim.

3. A CMS-1500 form dated January 1, 2009, reflects charges of $200.00 to Medicare for a replacement adhesive kit. A Nebraska state Medicaid program, "MEDICAID NEBRASKA," is listed as the beneficiary's secondary insurance provider in Box 9d. The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

4. A CMS-1500 form dated February 25, 2009, reflects charges of $110.00 to Medicare for a replacement adhesive kit. A New York state Medicaid program, "MEDICAID NY SCS," is listed as the beneficiary's secondary insurance provider in Box 9d. The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

5. A CMS-1500 form dated April 3, 2009, reflects charges of $165.00 to Medicare for a replacement adhesive kit. A New York state Medicaid program, "MEDICAID NY," is listed as the beneficiary's secondary insurance provider in Box 9d. The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

6. A CMS-1500 form dated April 3, 2009, reflects charges of $110.00 to Medicare for a replacement adhesive kit. A Mississippi state Medicaid program, "MS DIVISION OF MEDICAID," is listed as the beneficiary's secondary insurance provider in Box 9d. The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

7. A CMS-1500 form dated April 21, 2009, reflects charges of $55.00 to Medicare for a replacement adhesive kit. A New York state Medicaid program, "MEDICAID NY," is listed as the beneficiary's secondary insurance provider in

Box 9d.  The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

8. A CMS-1500 form dated April 25, 2009, reflects charges of $55.00 to Medicare for a replacement adhesive kit.  A Michigan state Medicaid program, "MEDICAID OF MI," is listed as the beneficiary's secondary insurance provider in Box 9d.  The corresponding Physicians' Order, signed by Dr. Bratislav Velimirouic on July 19, 2009, does not indicate a diagnosis code, yet the code 724.2 appears on the claim form.

9. A CMS-1500 form dated June 2, 2009, reflects charges of $110.00 to Medicare for a replacement adhesive kit.  "MEDICAID" is listed as the beneficiary's secondary insurance provider in Box 9d.  The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

10. A CMS-1500 form dated June 2, 2009, reflects charges of $110.00 to Medicare for a replacement adhesive kit.  A Mississippi state Medicaid program, "MS DIVISION OF MEDICAID," is listed as the beneficiary's secondary insurance provider in Box 9d.  The code 724.2 appears on the CMS-1500 form although BSNC had no Physicians' Order on file.

11. A CMS-1500 form dated June 2, 2009, reflects charges of $110.00 to Medicare for a replacement adhesive kit.  A Washington state Medicaid program, "WASHINGTON MEDICAID," is listed as the beneficiary's secondary insurance provider in Box 9d.  The codes 722.52 and 722.83 appear on the CMS-1500 form although BSNC was never in possession of a Physicians' Order.

12. A CMS-1500 form dated June 29, 2009, reflects charges of $110.00 to Medicare for a replacement adhesive kit.  A New York state Medicaid program, "MEDICAID NY SCS," is listed as the beneficiary's secondary insurance provider in Box 9d.  The corresponding Physicians' Order, signed by Dr. Hussein Omar on July 24, 2009, includes four diagnosis codes, none of which were 724.2, yet the code 724.2 is the only diagnosis code appearing on the claim form.

As a direct result of BSNC's systematic fraudulent billing practices, Medicare and Medicaid programs paid false claims, falsely certified to by BSNC, and have been damaged in an amount to be determined.

## VII.   UNLAWFUL RETALIATION AGAINST RELATORS BAHNSEN AND FUENTES

143.    As described in this First Amended Complaint, Relators were trained and directed by BSNC to assist BSNC in its fraudulent schemes.  BSNC unlawfully retaliated against Relators Bahnsen and Fuentes for protected activity, including internal reporting and investigation of BSNC's fraudulent conduct, which was reported to BSNC on multiple occasions.

144.    After complaining about BSNC's unlawful billing practices to their supervisors, Relators were disciplined for continually pointing out the Medicare billing fraud being carried out, and that Relators were forced to engage in as a condition to keeping their jobs.

145.    As a consequence of the Relators' internal complaints, BSNC conducted its own an internal investigation, which included interviews of Relators by BSNC's corporate parent Boston Scientific Corporation's Compliance Officer dispatched from corporate headquarters in Natick, Massachusetts.  Relators were also interviewed by outside counsel hired by BSNC and/or Boston Scientific Corporation.

146.    Even after Relators' multiple complaints, rather than modify its billing practices to comply with the law, BSNC deliberately chose to continue its fraudulent billing activity.

147.    The billing and collections backlog, and the short-cuts being taken, were regular topics of discussion, often contentious, in billing and collection meetings, and in interactions between Relators and BSNC management.  Their internal complaints include the fraudulent billing conduct described herein.

148.    At the time of her training, Relator Bahnsen, who had been trained in complaint government billing practices, was told about the routine use of 724.2 diagnosis code by BSNC's trainer and a long-time BSNC employee.  Given her background and knowledge of Medicare compliance requirements, Ms. Bahnsen questioned the use of code 724.2 in the absence of any diagnosis, and in circumstances where BSNC actually did have a physician's Order that included a diagnosis code, and stated to the trainer that such conduct was illegal.

149.    The BSNC trainer's responded by telling Relator Bahnsen that the routine use of 724.2 was BSNC's long-standing procedure for billing, and that she should just deal with it, and that she would "get used to it."  It was explained to Relator Bahnsen that BSNC's policy of using code 724.2 was the best way to ensure prompt Medicare payment to deal with the thousands of backlogged invoices.

150.    To drive home the BSNC trainer's point, the trainer wrote the code number 724.2 on a pink post-it note, and stuck it on Relator Bahnsen's computer screen.

151.    Relators were also trained to forget contacting doctors to obtain Orders and diagnosis codes, and instead just routinely use code 724.2.

152.    BSNC did not provide Relators with compliance training, nor compliance policies compliance plans, or emphasize compliance with law.

153.    Other medical billers did what they were told and did not complain.  BSNC's trainer was one of the most prolific billers at submitting fraudulent claims.  A BSNC program which tracks all billing activity, called the "Zirmed" database, shows numerous claims filed by the trainer a day, often over 100 (e.g. on September 23, 2009) and, remarkably, over 200 claims on September 3, 2009.  Only by taking BSNC's unlawful shortcuts could someone submit this many claims to the Government.   BSNC managers accordingly praised and rewarded the trainer's efforts (while at the same time punishing Relators for complaining internally about BSNC's illegal practices and efforts to change those).

154.    In mid-June 2009 Relator Bahnsen became increasingly troubled by BSNC's fraudulent billing policies.  In her effort to bring to BSNC management information to change its policy, she provided the then the Billing and Collections Manager copies of Medicare billing guidelines, and examples of the falsified claims.   By raising these issues, Relators caused extreme friction within the billing and collections department.

155.    In mid-July 2009, Relator Bahnsen decided she did not want to have any further part in signing (and falsifying) the CMS-1500s, since they were routinely false.  She attended the weekly billing and collections meeting and complained (as she had done numerous times) about BSNC's policy of falsifying the CMS-1500, including that signing the falsified CMS-1500 was illegal.  This meeting was held in a meeting room at BSNC's Valencia, California headquarters. In attendance were billing and collections employees, and a supervisor.    The supervisor responded to Relator Bahnsen by instructing Ms. Bahnsen to "give me" the CMS-1500s for signature.

156.    Thereafter, Relator Bahnsen brought stacks of previously falsified, but as yet unsigned CMS-1500s for the supervisor to sign, which were returned to Relator Bahnsen signed.

157.    After the mid-July 2009 meeting, in or around September 2009, Relators were banned from future group meetings.  The group meetings continued, but only with those billers willing to cooperate in the fraudulent billing scheme.  One supervisor told Relator Bahnsen to not waste time trying to locate physician Orders.

158.    In August 2009, a "Written Corrective Action Memorandum" signed by Dawn La Manna, Supervisor, Billing & Collections, was presented to Ms. Bahnsen, which was a pretext to facilitate her eventual firing for her repeated intern complaints and investigation about billing fraud.

159.    Prior to the escalation in Realtors' internal complaints, Relator Bahnsen was praised by Supervisor La Manna for her efforts.  In a June 5, 2009 e-mail response to Miri Pipkins-Harper, Supervisor, Corporate Credit, Finance/Accounting who had noted Relator's exceptional performance, Supervisor La Manna wrote back thanking Ms. Pipkins-Harper for the "positive feedback concerning Wendy's interactions between your group and ours."  Supervisor La Manna goes on to say "Wendy's tenacity and compassion for our customers sets a great example for all of us.  Her commitment to improve quality of patient care lines up perfectly with BSCI's vision of excellence."

160.    The e-mail string concludes with a follow-on e-mail from Supervisor La Manna to Relator Bahnsen:  "This was my response to her e-mail; the important people were also included on the e-mail. I printed her email and put it in your personnel file for your annual review." You should keep a copy for yourself."  The "important" people Supervisor La Manna copied were Elliott O'Neil (Director Customer Support, who was aware of the falsified billing); Melissa Deal and Tony McAnally (VP Finance), who were also copied on the e-mail from Ms. Pipkins.   In a June 9, 2009 e-mail from Supervisor La Manna to Relator Bahnsen, copied to Elliott O'Neill,

58

Supervisor La Manna encouraged Wendy to keep developing her communication skills, and that Supervisor La Manna "look[ed] forward to seeing you grow in this area and I am proud that you are a member of my team."

161.    Following the internal complaints to her employer, BSNC was informed that Relator Bahnsen intended to file a whistleblower case against BSNC.  Shortly thereafter she was terminated.

162.    Relator Fuentes was not, at that time, terminated, but was subjected to a hostile workplace.  She was eventually cut-off from computer access, and forced to work in an oppressive environment, until she left BSNC.

163.    As a result of Relators' internal complaints to BSNC, and the ensuing escalation of their complaints and investigation, as well as BSNC being notified of the possibility of a whistleblower lawsuit being filed against it, BSNC retaliated against Relators.

**COUNT I**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))**[1]

164.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

165.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to CMS, or other Government Programs, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

---

[1] To the extent wrongdoing occurred after May 20, 2009, this First Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

166.   The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may still be paying or reimbursing, for DME supplied to patients enrolled in Government Programs.

167.   As a result of Defendant's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))[2]

168.   Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

169.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

170.   The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may still be paying or reimbursing, for DME supplied to patients enrolled in Government Programs.

171.   As a result of Defendant's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

---

[2] To the extent wrongdoing occurred after May 20, 2009, this First Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3730(h))

172.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

173.    As result of Relators' lawful acts in furtherance of protected activities in the investigation and reporting of fraud, threats to file a whistleblower lawsuit against Defendant, and Defendant's having notice thereof, Defendant retaliated against Relators.

174.    Relators' termination of employment was a direct result of Defendant's retaliatory acts, causing Relators to suffer, and continue to suffer, substantial compensatory and special damages, in an amount to be proven at trial.

## COUNT IV
### (Violation of California False Claims Act)

175.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

176.    This is a civil action brought by Relators, on behalf of the State of California, against Defendant under the California False Claims Act, Cal. Gov't Code § 12652(c).

177.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

178.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal.

Gov't Code § 12651(a)(2).

179.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

180.     The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

181.     As a result of Defendant's actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT V**
**(Violation of Colorado Medicaid False Claims Act)**

182.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

183.     This is a civil action brought by Relator, on behalf of the State of Colorado, against Defendant under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

184.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an

officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

185.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

186.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

187.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

188.    As a result of Defendant's actions, as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VI
### (Violation of Connecticut False Claims Act)

189.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

190.    This is a civil action brought by Relator, on behalf of the State of Connecticut, against Defendant under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

191.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

192.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

193.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

194.    The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

195.    As a result of Defendant's actions, as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VII**
**(Violation of Delaware False Claims and Reporting Act)**

196.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

197.    This is a civil action brought by of Relator, on behalf of the State of Delaware, against Defendant under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

198.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

199.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

200.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

201.     The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of healthcare programs funded by the State of Delaware.

202.     As a result of Defendant's actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### (Violation of District of Columbia False Claims Act)

203.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

204.     This is a civil action brought by Relator, on behalf of the District of Columbia, against Defendant under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

205.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

66

206.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

207.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

208.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

209.    As a result of Defendant's actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT IX**
**(Violation of Florida False Claims Act)**

210.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

211.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendant under the Florida False Claims Act, Fla. Stat. § 68.083(2).

212.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

213.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

214.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

215.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

216.    As a result of Defendant's actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT X
### (Violation of Georgia False Medicaid Claims Act)

217.    Relators incorporate herein by reference the preceding paragraphs of this First

Amended Complaint as though fully set forth herein.

218.    This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendant pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

219.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

220.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

221.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

222.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

223.     As a result of Defendant's actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
## (Violation of Hawaii False Claims Act)

224.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

225.     This is a civil action brought by Relator, on behalf of the State of Hawaii, against Defendant under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

226.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

227.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

228.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

229.     The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

230.     As a result of Defendant's actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII
### (Violation of Illinois False Claims Whistleblower Reward and Protection Act)

231.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

232.     This is a civil action brought by Relator, on behalf of the State of Illinois, against Defendant under the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/4(b).

233.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois, or a member of the Illinois National Guard, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

234.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false record or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

235.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

236.     The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

237.     As a result of Defendant's actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XIII
### (Violation of Indiana False Claims and Whistleblower Protection Act)

238.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

239.     This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendant under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

240.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

72

241.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

242.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

243.     The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

244.     As a result of Defendant's actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV
### (Violation of Louisiana Medical Assistance Programs Integrity Law)

245.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

246.     This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against Defendant under the Louisiana Medical Assistance

Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

247.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

248.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

249.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

250.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendant, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendant's claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

251.    As a result of Defendant's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may

74

continue to be, severely damaged.

## COUNT XV
### (Violation of Massachusetts False Claims Act)

252.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

253.    This is a civil action brought by Relator, on behalf of the Commonwealth of Massachusetts, against Defendant under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

254.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

255.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

256.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

257.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

258.    As a result of Defendant's actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XVI
### (Violation of Michigan Medicaid False Claims Act)

259.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

260.    This is a civil action brought by Relator, on behalf of the State of Michigan, against Defendant under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

261.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

262.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

263.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendant has applied for or is receiving a benefit with intent to obtain a benefit to which Defendant were not entitled or in an amount greater than that to which Defendant were entitled, in violation of Mich. Comp. Laws § 400.603(3).

264.     Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

265.     The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

266.     As a result of Defendant's actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVII
## (Violation of Minnesota False Claims Act)

267.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

268.    This is a civil action brought by Relator, on behalf of the State of Minnesota, against Defendant under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

269.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

270.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

271.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

272.    The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

273.   As a result of Defendant's actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVIII**
**(Violation of Montana False Claims Act)**

274.   Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

275.   This is a civil action brought by Relator, on behalf of the State of Montana against, Defendant under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

276.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

277.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

278.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

79

279.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

280.    As a result of Defendant's actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX
### (Violation of Nevada False Claims Act)

281.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

282.    This is a civil action brought by Relator, on behalf of the State of Nevada, against Defendant under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

283.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

284.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

285.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

286.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

287.    As a result of Defendant's actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XX
### (Violation of New Jersey False Claims Act)

288.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

289.    This is a civil action brought by Relator, on behalf of the State of New Jersey, against Defendant pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

290.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

291.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

292.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

293.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

294.    As a result of Defendant's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXI
### (Violation of New Mexico Medicaid False Claims Act)

295.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

296.    This is a civil action brought by Relator, on behalf of the State of New Mexico, against Defendant under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B).

297.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

298.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann. § 27-14-4(C).

299.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico, or its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

300.     The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

301.    As a result of Defendant's actions, as set forth above, the State of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXII
### (Violation of New York False Claims Act)

302.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

303.    This is a civil action brought by Relator, on behalf of the State of New York, against Defendant under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

304.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer, employee or agent of the State of New York, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

305.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved by the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(b).

306.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

84

307.     The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

308.     As a result of Defendant's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXIII
### (Violation of North Carolina False Claims Act)

309.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

310.     This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendant under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

311.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

312.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

313.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

314.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

315.    As a result of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIV
## (Violation of Oklahoma Medicaid False Claims Act)

316.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

317.    This is a civil action brought by Relator, on behalf of the State of Oklahoma, against Defendant pursuant to the Oklahoma Medicaid Fraud False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

318.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

319.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

320.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

321.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

322.    As a result of Defendant's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXV**
**(Violation of Rhode Island False Claims Act)**

323.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

324.    This is a civil action brought by Relator, on behalf of the State of Rhode Island, against Defendant pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

325.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

326.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

327.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

328.    The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

329.    As a result of Defendant's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI
### (Violation of Tennessee Medicaid False Claims Act)

330.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

331.     This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendant under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

332.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

333.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

334.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

89

335.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

336.    As a result of Defendant's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXVII
### (Violation of Texas Medicaid Fraud Prevention Act)

337.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

338.    This is a civil action brought by Relator, on behalf of the State of Texas against, Defendant under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

339.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

340.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not

authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

341.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

342.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

343.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

344.    As a result of Defendant's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVIII
### (Violation of Virginia Fraud Against Taxpayers Act)

345.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

346.     This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendant under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

347.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

348.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

349.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

350.     The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

351.    As a result of Defendant's actions, as set forth above, the Commonwealth of

Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXIX
### (Violation of Wisconsin False Claims for Medical Assistance Law)

352.    Relators incorporate herein by reference the preceding paragraphs of this First

Amended Complaint as though fully set forth herein.

353.    This is a civil action brought by Relator, on behalf of the State of Wisconsin,

against Defendant under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat.

§ 20.931(5)(a).

354.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to

any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or

fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

355.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made

or used, false records or statements to obtain approval or payment of false claims for medical

assistance, in violation of Wis. Stat. § 20.931(2)(b).

356.    The State of Wisconsin, or its political subdivisions, unaware of the falsity of the

claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-

related management services for recipients of state funded health insurance programs.

93

357.   As a result of Defendant's actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

**WHEREFORE,** Relators pray for judgment against Defendant as follows:

A.   That Defendant be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 17b-301a *et seq.*; Del. Code Ann. tit. 6, § 1201 *et seq.*; D.C. Code § 2-308.13 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 49-4-168 *et seq.*; Haw. Rev. Stat. § 661-21 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; La. Rev. Stat. Ann. § 46:439.1 *et seq.*; Md. Code Ann., Health-Gen. § 2-601 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. § 17-8-401 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.M. Stat. Ann. § 27-14-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, § 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Va. Code Ann. § 8.01-216.1 *et seq.*; and Wis. Stat. § 20.931 *et seq.*

B.   That judgment be entered in Relators' favor and against Defendant in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(d) and 3730(h), Cal. Gov't Code § 12652(g)(4), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e(e), Del. Code Ann. tit. 6, § 1205, D.C. Code § 2-308.15(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-11-5.5-6, La. Rev. Stat. Ann. § 439.4, Md. Code Ann., Health-Gen. § 2-605, Mass. Gen. Laws ch.12, § 5F, Mich. Comp. Laws § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.210, N.J. Stat. Ann. § 2A:32C-7, N.M. Stat. Ann. § 27-14-9, N.Y. State Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. tit. 63, § 5053.4, R.I. Gen. Laws § 9-1.1-4(d), Tenn. Code Ann. § 71-5-183(d), Tex. Hum. Res. Code Ann. § 36.110, Va. Code Ann. § 8.01-216.7, and Wis. Stat. § 20.931(11), including without limitation (i) reinstatement of employment with no diminution of seniority, (ii) double back-pay for the period since his unlawful retaliatory termination, (iii) interest on such back-pay, and (iv) special damages, including reasonable attorneys' fees and litigation costs.

D.     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand dollars ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

E.     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as

95

provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

     **F.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

     **G.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Delaware False Claims and Reporting Act, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**H.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**I.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**J.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**K.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**L.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**M.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**N.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for

in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by La. Rev. Stat. Ann. § 46:438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

O.      That judgment be entered in Relators' favor and against Defendant for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than five thousand dollars ($5,000) dollars and not more than ten thousand dollars ($10,000), plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendant's actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

P.      That judgment be entered in Relators' favor and against Defendant for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits

provided as a result of Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendant's unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Q.      That judgment be entered in Relators' favor and against Defendant for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendant's unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

R.      That judgment be entered in Relators' favor and against Defendant for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such

multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**S.**     That judgment be entered in Relators' favor and against Defendant for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**T.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the federal False Claims Act (31 U.S.C. § 3729 *et seq*.) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**U.**     That judgment be entered in Relators' favor and against Defendant for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.M. Stat. Ann. § 27-14-4, multiplied as provided for in N.M. Stat. Ann. § 27-14-4, to the extent such

multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relators' favor and against Defendant for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

W. That judgment be entered in Relators' favor and against Defendant for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

X. That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as

provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

      **Y.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws §  9-1.1-3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by R.I. Gen. Laws §  9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

      **Z.**     That judgment be entered in Relators' favor and against Defendant for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to Tenn. Code Ann. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**AA.**     That judgment be entered in Relators' favor and against Defendant for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**BB.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**CC.**     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in Wis. Stat. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Wis. Stat. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

**DD.**     That Defendant be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

**EE.**     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), and all State *Qui Tam* statutes;

**FF.**     That judgment be granted for Relators to compensate for Defendant's unlawful retaliation against them for their lawful and protected whistleblowing activities;

**GG.**     That Relators be awarded compensatory and punitive damages to compensate them for embarrassment and emotional distress;

**HH.**     That judgment be granted for Relators against Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees and expenses incurred by Relators in the prosecution of this suit; and

**II.**     That Relators be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.

Dated: September 10, 2012

*s/ Nicholas C. Harbist*

Nicholas C. Harbist
Blank Rome LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone:  609-750-2991
Facsimile:  609-897-7442

*Attorneys for Relators*

Thomas J. Poulin
W. Scott Simmer
Blank Rome LLP
Watergate
600 New Hampshire Ave., NW
Washington DC 20037
Telephone: 202-772-5986
Facsimile:  202-572-8432

*Of Counsel*
