William Christopher Carmody
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas
32nd Floor
New York, NY 10019-6022
Phone: (212) 336-8330

Grant W. McGuire
MCMANIMON, SCOTLAND & BAUMANN, LLC
75 Livingston Avenue
2nd Floor
Roseland, NJ 07068
Phone: (973) 622-4868

*Attorneys for Relators/Counterclaim-Defendants*
(Additional attorneys on the signature page)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* WENDY A. BAHNSEN, et al.,<br><br>                       Plaintiffs/Relators,<br><br>   v.<br><br>BOSTON SCIENTIFIC NEUROMODULATION<br>CORPORATION,<br><br>                  Defendant.<br><br>-----------------------------------------------------------x<br><br>BOSTON SCIENTIFIC NEUROMODULATION<br>CORPORATION,<br><br>      Counterclaim-Plaintiffs,<br><br>  v.<br><br>WENDY BAHNSEN AND CAROLINA<br>FUENTES,<br><br>       Counterclaim-Defendants. | Civil Action No. 11-cv-1210 (JMV)<br>(SCM)<br><br>**MEMORANDUM OF LAW IN<br>SUPPORT OF MOTION FOR<br>ATTORNEYS' FEES, COSTS<br>AND EXPENSES PURSUANT TO<br>31 U.S.C. § 3730(d)**<br><br>**MOTION DAY: JULY 15, 2019**<br><br><u>ORAL ARGUMENT REQUESTED</u> |

# Table of Contents

Page(s)

INTRODUCTION .................................................................................1

DISCUSSION .....................................................................................4

   I.    LEGAL STANDARD ..........................................................4

   II.   THE HOURS EXPENDED BY RELATORS' COUNSEL
        ARE REASONABLE ..........................................................7

   III.  SG'S HOURLY RATES ARE REASONABLE ...............................15

   IV.  SG'S REQUESTED FEES AND EXPENSES ARE
        REASONABLE GIVEN THE EXCELLENT
        SETTLEMENT OBTAINED...........................................................23

   V.    SG'S COSTS AND EXPENSES ARE REASONABLE....................25

CONCLUSION .......................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Auto. Parts Antitrust Litig.*,
  12-md-2311 (E.D. Mich.) ................................................................................16

*Avaya Inc. v. Telecom Labs, Inc.*,
  2016 WL 10590071 (D.N.J. Sept. 16, 2016)....................................................25

*Barbour v. City of White Plains*,
  700 F.3d 631 (2d Cir. 2012) ............................................................................24

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989) (discussing fee awards under 42 U.S.C. §
  1988) ...................................................................................................................7

*Boles v. Wal-Mart Stores, Inc.*,
  2015 WL 4653233 (D.N.J. Aug. 5, 2015) ........................................................14

*City of Burlington v. Dague*,
  505 U.S. 557 (1992).............................................................................................2

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986)...........................................................................................24

*Dartell v. Tibet Pharm. Inc.*,
  2017 WL 2815073 (D.N.J. June 29, 2017) (Vazquez, J.) .................................21

*United States ex rel. Depace v. Cooper Health Sys.*,
  940 F.Supp. 2d 208 (D.N.J. 2013).......................................................................6

*Fleisher v. Phoenix Life Ins. Co.*,
  11-cv-8405 (S.D.N.Y.) .....................................................................................16

*Fox v. Vice*,
  563 U.S. 826 (2011).............................................................................................6

*Graves v. Plaza Medical Centers Corp.*,
  No. 1:10-23382-CV, 2018 WL 3699325 (S.D. Fla. May 23, 2018) .................24

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)..................................................................................6

*United States ex rel. Hunt v. Cochise Consultancy*,
   887 F.3d 1081 (11th Cir. 2018) ...............................................................9

*U.S. ex rel. John Doe I v. Pennsylvania Blue Shield*,
   54 F. Supp. 2d 410 (M.D. Pa. 1999).......................................................7

*United States ex rel. Joseph F. Tommasino, P.A., PhD v. Guida*,
   No. 10CV4644JFBAKT, 2017 WL 878587 (E.D.N.Y. Mar. 6,
   2017) .......................................................................................................22

*Kassim v. City of Schenectady*,
   415 F.3d 246 (2d Cir. 2005) ...................................................................12

*Keenan v. City of Philadelphia*,
   983 F.2d 459 (3d Cir. 1992) ...................................................................14

*In re Libor-Based Financial Instruments Litigation*,
   MDL No. 2262 (S.D.N.Y.) (NRB) ..........................................................17

*Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator &
   Standard Sanitary Corp.*,
   540 F.2d 102 (3d Cir. 1976) .....................................................................7

*Marthers v. Gonzales*,
   2008 WL 3539961 (E.D. Pa. Aug. 13, 2008) .........................................21

*McAfee v. Boczar*,
   738 F.3d 81 (4th Cir. 2013) ....................................................................24

*In re Municipal Derivatives Antitrust Litigation*,
   MDL No. 1950 (S.D.N.Y.) (VM)............................................................17

*Nat. Elec. Ben. Fund v. Starko Elec. Services, Inc.*,
   2010 WL 1049980 (D.N.J. March 6, 2010)............................................26

*P. Van Hove BVBA v. Universal Travel Group, Inc.*,
   2017 WL 2734714 (D.N.J. June 26, 2017) (Vazquez, J.) .....................22

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
   478 U.S. 546 (1986).................................................................................5

*Phillips Elecs. N. Am. Corp. v. Compo Micro Tech, Inc.*,
  2006 WL 3020724 (D. Del. Oct. 23, 2006) ......................................................21

*Planned Parenthood v. AG*,
  297 F.3d 253 (3d Cir. 2002) .......................................................................25, 26

*Polselli v. Nationwide Mutual Fire Insurance Co.*,
  126 F.3d 524 (3d Cir. 1997) .............................................................................7

*U.S. ex rel. Poulton v. Anesthesia Assocs. Of Burlington, Inc.*,
  87 F.Supp.2d 351 (D. Vt. 2000) .......................................................................6

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) .............................................................................5

*Rode v. Dellarciprete*,
  892 F.2d 1177 (3d Cir. 1990) ......................................................................7, 15

*Shanea S. v. School Dist. of Philadelphia*,
  2014 WL 2586940 (E.D. Pa. June 10, 2014).....................................................14

*Simring v. Rutgers*,
  634 Fed. Appx. 853 (3d Cir. 2015).....................................................................5

*Talone v. Am. Osteopathic Ass'n*,
  No. 1:16-CV-04644-NLH-JS, 2018 WL 6318371 (D.N.J. Dec. 3,
  2018) ...............................................................................................................22

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales
  Practices, & Prods. Liab. Litig.*,
  8:10-ml-02151 (C.D. Cal).................................................................................16

*U.S.A. v. CDW-Government, Inc.*,
  No. 305CV00033DRHPMF, 2013 WL 11267176 (S.D. Ill. May
  17, 2013) ..........................................................................................................22

*U.S. ex rel. Virgin Islands Housing Auth. v. Coastal General Const.
  Servs.*,
  299 F.Supp.2d 483 (D.V.I. 2004) ......................................................................24

*Washington v. Philadelphia Cnty. Court of Common Pleas*,
  89 F.3d 1031 (3d Cir. 1996) .............................................................................14

*Yedlowski v. Roka Bioscience, Inc.*,
   2016 WL 6661336 (D.N.J. Nov. 10, 2016) ...............................................6, 13, 20

**Statutes**

31 U.S.C. § 3720(d)(2)............................................................................................25

31 U.S.C. § 3730(d)(2)........................................................................................2, 4

## INTRODUCTION

After eight years, Relators and their counsel—Susman Godfrey L.L.P. and local counsel Grant McGuire[1] ("SG")—achieved a settlement of $2.5 million to resolve all claims against Defendant Boston Scientific Neuromodulation Corporation ("BSNC") and all counter-claims against the Relators.[2] SG pursued this case without compensation, risking the possibility of no recovery at all, while advancing nearly $1 million in out-of-pocket costs and expending more than $6.6 million in professional time. The settlement was won after eight years of hard-fought litigation; just a few weeks before the parties were set to pick a jury; and after the Court had resolved hotly contested motions for summary judgment, *Daubert* motions, and over twenty motions in *limine*. The settlement is an exceptional outcome for the Government, totaling over ***five times the total amount spent*** by the Government on the products at issue in the case. In fact, BSNC itself has taken the position that ***this settlement exceeds the upper limit of penalties*** that could be applied without violating the Due Process and Excessive Fines clauses of the Constitution.

---

[1] During the course of this litigation, Grant McGuire changed firms. Mr. McGuire moved from Tompkins, McGuire, Wachenfeld & Barry, LLP to McManimon, Scotland & Baumann, LLC.

[2] ███████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████.

This win is unprecedented for a False Claims Act case in which the Government declined to intervene. Most non-intervened cases are dismissed or settled for a small fraction of the claimed damages.[3] Even when the Government intervenes and brings the weight of the Department of Justice to bear, it rarely settles any case for more than a two-times multiplier of single damages, making the five-times recovery here exceptional.[4]

31 U.S.C. § 3730(d)(2) provides that in addition to any amount paid by the defendant to the Government, the defendant is separately responsible for payment of "an amount for reasonable expenses which the court finds to have been necessarily incurred," plus "reasonable attorneys' fees and costs," which relators' counsel "shall" receive. The statute makes clear that "[a]ll such expenses, fees, and costs shall be awarded against the defendant." The Supreme Court has "established a strong presumption that the lodestar represents the 'reasonable fee.'" *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992); *see also* THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 9:6 (West 2019). Here, the lodestar for SG is

---

[3] *See* Andrew E. Brashier, *The Federal Government's Chief Weapon in Combatting Fraud: The False Claims Act*, 34 ALA. ASS'N JUST. J. 60, 62 (2014) (noting "when the government intervenes there is a 95% chance of a settlement or successful verdict compared to the over 90% of cases dismissed when a whistleblower has to plow ahead without government intervention"); *see also* Elizabeth Wang, Trends in Qui Tam Cases, Law360 (July 26, 2011) (noting that average settlements in non-intervened cases were 7 times smaller than in intervened cases).

[4] *See* Jacob T. Elberg, *FCA Settlement Data Shows Need for Comprehensive Reform*, Law360 (Feb. 19, 2019).

$6,628,709 in fees and $879,173 in costs and expenses related to litigating the merits of the case; and $84,327 in fees and $29,698 in costs and expenses related to litigating this fee petition (and counting). *See* Declaration of Jordan Connors ("Connors Decl."), ¶¶ 18-24 & Ex. 9-12 (attaching contemporaneous time and expense records).

BSNC does ***not*** dispute that SG is entitled to an award of fees, costs, and expenses in this case. Rather, BSNC simply challenges the amount sought by SG as not "reasonable." BSNC can't meet its heavy burden here.[5] *First*, the time and expenses requested in this motion are eminently reasonable given the factual and legal complexity of this case, which included reviewing a production of over one million pages of documents, taking and defending eighteen depositions, including taking the depositions of five experts hired by BSNC alone, participating in two separate mediations and at least four settlement conferences, and filing and responding to numerous motions. *Second*, over the past 3.5 years, SG advanced nearly $1 million in out of pocket expenses and several million dollars in time on an entirely contingent basis. Precisely because of the caliber of its lawyers and willingness to commit a tremendous amount of financial resources to the case, SG overcame the significant risks of this case—Government declination, disqualified

---

[5] As explained below, Relators bear the burden of presenting evidence of the time spent on the matter, billing rates, and costs and expenses incurred. The burden then shifts to BSNC to persuade the Court that the claimed fees, costs and expenses are unreasonable.

prior counsel, and significant discovery, damages and claims-related obstacles, just to name a few. SG took on these risks for the public good, acting as a "private attorney general," with the lion's share of the recovery going to the Government, and not SG's clients. The Court should incentivize, not chill, the type of investment SG made in this case. *Third*, to verify the reasonableness of the requested fees, costs and expenses, SG tapped Justin Walder, a seasoned veteran of the New Jersey bar with over 50 years of experience, who independently reviewed the case file and SG's motion papers and in a detailed declaration accompanying this motion, confirms the reasonableness of SG' fee request. *See* Decl. of Justin Walder. For these reasons and those set forth further below, SG's motion for fees, costs, and expenses should be granted.

## DISCUSSION

### I.   LEGAL STANDARD

The FCA is a compulsory fee-shifting statute. When a non-intervened FCA action is settled, the relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." 31 U.S.C. § 3730(d)(2). "All such expenses, fees, and costs shall be awarded against the defendant." *Id.*

The widely-accepted standard for determining a reasonable attorneys' fee pursuant to a fee-shifting statute is the "lodestar" method, in which the Court

4

multiplies the reasonable number of hours expended by the reasonable hourly rate. The Third Circuit applies the lodestar method for calculating statutory attorneys' fees awarded under the FCA. *Simring v. Rutgers*, 634 Fed. Appx. 853, 857 (3d Cir. 2015) (applying lodestar method in a False Claims Act case). The Third Circuit has instructed that, when using the lodestar method to assess the reasonableness of a fee, "district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005). Only the blended rate allows courts to fairly assess the lodestar and any lodestar multiplier, which would be skewed if courts focused on the rates of any particular timekeeper. Additionally, where there is a wide range of billing rates, as is the case here, the blended rate will indicate whether more senior attorneys appropriately delegated tasks to more junior attorneys and staff.

The applicant bears the burden of presenting evidence of its time spent on the matter, billing rates, and costs and expenses incurred. The burden then shifts to the challenger—here BSNC—to persuade the Court that the claimed fees, costs and expenses are unreasonable. The Supreme Court has established a "strong presumption," however, that the lodestar "represents a 'reasonable' fee," which is "wholly consistent" with the rationale behind fee-shifting statutes such as the FCA. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). Congress recognized that relators need to secure competent counsel in

bringing FCA actions on behalf of the United States, and the "[u]navailability of attorneys fees inhibits and precludes many individuals, as well as their attorneys, from bringing civil fraud suits." *United States ex rel. Depace v. Cooper Health Sys.*, 940 F.Supp. 2d 208, 215 (D.N.J. 2013) (quoting S. Rep. No. 99-345, at 29 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5294). BSNC's payment of SG's lodestar is therefore crucial to the success of the FCA.

In determining a "reasonable" fee, the Court's task is not to achieve "auditing perfection," but rather to ensure that the requested award achieves "rough justice" when considering all the facts and circumstances of the case. *Fox v. Vice*, 563 U.S. 826, 838 (2011) (stating that courts "need not, and indeed should not, become green-eyeshade accountants" because "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."); *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation."). The circumstances surrounding the litigation include the inherent risks of a contingent fee matter. *See, e.g.*, *Yedlowski v. Roka Bioscience, Inc.*, 2016 WL 6661336, at *21 (D.N.J. Nov. 10, 2016) ("Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."). In some instances, courts may also provide for an "upward adjustment" of the lodestar depending on the risks in litigating the claims. *E.g.*, *U.S. ex rel. Poulton v. Anesthesia Assocs. Of Burlington,*

6

*Inc.*, 87 F.Supp.2d 351, 358-59 (D. Vt. 2000) (awarding a 10% upward adjustment of the lodestar); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117-18 (3d Cir. 1976) (stating an enhancement of the lodestar might be appropriate because of "the quality of [the attorneys'] work").

Fees, costs, and expenses incurred in litigating the amount of the fee award—so-called "fees on fees"—are compensable as well. *U.S. ex rel. John Doe I v. Pennsylvania Blue Shield*, 54 F. Supp. 2d 410, 414 (M.D. Pa. 1999) ("[T]ime expended by attorneys seeking an award on fees (sometimes called 'fees on fees') justifiably may be included in the application and the award"); *see also Polselli v. Nationwide Mutual Fire Insurance Co.*, 126 F.3d 524, 537 (3d Cir. 1997).

The appropriate award of fees, costs, and expenses is a matter committed to the District Court's sound discretion. *Rode v. Dellarciprete*, 892 F.2d 1177, 1182-83 (3d Cir. 1990).

## II.    THE HOURS EXPENDED BY RELATORS' COUNSEL ARE REASONABLE

The United States Supreme Court has emphasized that "counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter." *Blanchard v. Bergeron*, 489 U.S. 87, 91 (1989) (discussing fee awards under 42 U.S.C. § 1988) (internal quotations and citations omitted). Here, SG expended 10,725 hours prosecuting this

matter over 3.5 years (and, now, at least another 124 hours litigating this fee dispute). These hours reflect both the complexity of this case and BSNC's obfuscation. Moreover, these hours were diligently logged in detailed and contemporaneous time sheets maintained by the firm. *See* Connors Decl. Ex. 9-12 (attaching contemporaneous time and expense records).

Relator's counsel performed the work that reasonably diligent lawyers would perform against a sophisticated and well-represented adversary. This includes, among other things, the time spent reviewing the case history, researching legal issues, reviewing a production of over one million pages of documents, preparing and filing numerous letter motions, including to compel production of documents, briefing motions for summary judgment, briefing *Daubert* motions, preparing for and attending numerous status conferences and hearings, preparing for and attending two separate mediations, engaging in written discovery, taking and defending eighteen depositions, briefing over twenty motions in *limine*, preparing for trial, and preparing and filing settlement papers. *See* Connors Decl. ¶ 2. As this Court recognized in approving settlement, the parties were represented by "experienced and capable counsel" and the case was "fully litigated." Dkt. 468.

Despite substantial obstacles, SG achieved a significant settlement on behalf of the Government to resolve all claims against BSNC and all counter-claims against the Relators. Non-intervened cases like this one are routinely dismissed, and very

8

few non-intervened cases result in meaningful settlements. *United States ex rel. Hunt v. Cochise Consultancy*, 887 F.3d 1081, 1087-88 (11th Cir. 2018) ("When the United States elects to intervene, about 90 percent of the time the case generates a recovery, either through a settlement or a final judgment. But only about 10% of non-intervened cases result in recovery."). Even when the government intervenes, it rarely settles any case for more than a two-times multiplier of damages, making the five-times recovery here exceptional. *See* Jacob T. Elberg, *FCA Settlement Data Shows Need for Comprehensive Reform*, Law360 (Feb. 19, 2019).

This case presented SG with unique difficulties and challenges from the outset given the disqualification of prior counsel, which required SG to litigate this case basically from scratch; BSNC's repeated efforts to prevent Relators from obtaining discovery, including the refusal to turn over critical claims data or furnish access to the company's live database, requiring a Herculean expert-driven analysis by Relators; BSNC's hiring of five different experts and refusal to produce further documents, requiring the need to take and defend eighteen depositions in the case; and while Relators and BSNC may disagree about the specifics of the settlement dialog, the parties never discussed a settlement in the zip code of the amount SG secured, which occurred only after SG won significant rulings on summary judgment and motions in *limine*, and invested millions of dollars in additional time and

resources in this case. *See, e.g.,* Connors Decl. Ex. 1 (BSNC deferring mediation until after claims MIL resolved).

Through their efforts, SG secured not only an outstanding recovery for the Government, but also litigated to success novel issues concerning the interpretation and application of the relevant Medicare rules and regulations, providing a further benefit to the Government by clarifying the practices that are appropriate for the hundreds of thousands of providers in the Medicare network.

Importantly, Courts take into account the defendant's conduct in assessing the reasonable amount of hours required to prosecute a case. Despite being made aware that the FCA was a fee-shifting statute, BSNC resisted settling this case until the eve of trial. BSNC's lawyers fought tooth and nail with SG over every aspect of this case, which served only to expand the amount of hours required to fully prosecute this action, including:

- **BSNC refused to produce its claim data**. SG had to obtain records of BSNC's claims for payment to Medicare via subpoena, which required extensive research and negotiation with Medicare to identify not only the appropriate Medicare Administrative Contractor ("MAC") in possession of the data, but also the identifying information needed to locate all relevant claims.

- **When BSNC finally produced its physician orders, it did so in an unordered nearly one-million page document dump**. BSNC produced paper records from its "WebXtender" database, refusing to provide the electronic interface for the database itself. As a result, SG had to manually sift through nearly one million pages of poorly-scanned medical records to identify the relevant physician orders that matched BSNC's Medicare claims.

- **BSNC served 22 privilege logs, spanning 284 pages and 2,374 line entries**. Relators doggedly pursued improperly withheld materials from the logs, leading BSNC to produce a large amount of previously withheld material.

- Due to BSNC's claim that SG's discovery requests had been forfeited by Blank Rome, there were extensive meet and confers and presentation of discovery disputes to the Court – including **no less than 12 conferences with the Court.**

- With limited exceptions, the Magistrate Judge did not allow SG to supplement the paper discovery Blank Rome had obtained from BSNC. Accordingly, SG had to fill in the gaps through depositions. **SG took 16 depositions, which resulted in case-dispositive admissions that allowed Relators to survive summary judgment**, and the exclusion of large parts of BSNC's proposed expert testimony. SG also defended 2 depositions (of Relators' experts).

- After Relators prevailed on summary judgment, BSNC raised disputes about the pre-trial submissions, such as the length of Relators' exhibit list and deposition designations, which resulted in motion practice, and **three separate submissions of a proposed pre-trial order**, as Relators tried reasonably to accommodate BSNC's requests and avoid burdening the Court.

BSNC may argue that SG filed fruitless discovery motions. To the contrary, *See generally* Connors Decl. ¶¶ 7-9. SG filed necessary discovery motions after BSNC refused to provide critical discovery that was necessary to prosecute this case. The hours that SG devoted to this action—which was vigorously opposed at every stage by BSNC—were reasonable and necessary. *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) ("[I]f the attorney is compelled to defend against frivolous motions and to make motions to compel compliance with routine discovery demands, or to respond to unreasonable demands of the court for briefing or for wasteful, time-consuming court appearances, the hours required to litigate even a simple matter can expand enormously. It is therefore difficult to generalize about the appropriate size of the fee in relation to the amount in controversy.").

Contrary to BSNC's claim that SG's time was "excessive," SG expended only the time necessary to achieve a successful result. SG undertook this case entirely on contingency and with no guarantee its time or out-of-pocket expenses would ever be reimbursed. And SG had to advance litigation costs in this case for over 3.5 years.

12

The risk of this litigation weighs in favor of SG's fee request. Courts consistently recognize that the risk of little or no recovery is an important favor supporting an attorneys' fee award. *Yedlowski*, 2016 WL 6661336, at *21. The risk was not just that the case would be decided unfavorably at summary judgment. When a law firm takes a case on contingency, it incurs the obligation to continue with representation even if it becomes clear the case will never be profitable. Thus, counsel risked that it would be unable to secure a substantial settlement, or would spend thousands of hours of time and a million in costs and expenses taking this case through summary judgment and trial to obtain a judgment no better than the settlement they have today, and therefore having to write off much of its time. The contingent nature of this case and the uncertainty of whether their time would be compensated at all underscores the reasonableness of the hours expended. It means that Relators' counsel wasted no time, focusing instead only on tasks necessary to obtain a successful result.

Further, BSNC's charge that hours spent were unreasonable or billing entries vague should not be heard when their counsel refused to turn over their own billing records to Relators. SG's contemporaneous time records demonstrate, chronologically, how each timekeeper that worked on this case spent their time, describing each activity performed in sufficient detail. Counsel need only document the hours expended on the litigation with "sufficient specificity" to the "extent necessary for the district court to 'determine if the hours claimed are unreasonable

for the work performed.'" *Washington v. Philadelphia Cnty. Court of Common Pleas*, 89 F.3d 1031, 1037 (3d Cir. 1996); *see also Keenan v. City of Philadelphia*, 983 F.2d 459, 473 (3d Cir. 1992) (approving use of summaries that listed date, time consumed, and general description of activities performed of each attorney); *Boles v. Wal-Mart Stores, Inc.*, 2015 WL 4653233, at *8 (D.N.J. Aug. 5, 2015) (finding that general descriptions of activity, such as "t/c with client" have been found sufficiently specific by courts in the Third Circuit and that time entries need not provide "the exact activity performed each hour to be sufficiently specific"); *Shanea S. v. School Dist. of Philadelphia*, 2014 WL 2586940, at *5 (E.D. Pa. June 10, 2014) (finding "legal research" to be a sufficiently specific time entry). Additionally, where, as here, the time entries focus only on a single defendant that engaged in a fraudulent scheme that formed the core set of facts, the time entries require less specificity than a case involving multiple parties and multiple claims.

And any "discount" based on particular time entries is particularly inappropriate here, given that Relators do not seek any multiplier on SG's lodestar (despite being permitted in the discretion of the Court), and the fees sought are already deeply discounted because they do not include any billing by prior counsel, even for work done that was unrelated to their disqualification. Connors Decl. ¶¶ 19, 25. In fact, BSNC forbade SG from relying on any of prior counsel's research and

work product when SG entered this case, driving up the fees and resources that SG had to spend to get up to speed.

### III.   SG'S HOURLY RATES ARE REASONABLE

After determining the number of hours reasonably expended, the district court must examine whether the requested hourly rate is reasonable. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). To determine a reasonable hourly rate, the Court must "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode*, 892 F.2d at 1183.

SG's skill, experience, and reputation is unparalleled. "Pick your metric— money, U.S. Supreme Court clerks, bet-the-company cases, percentage of partners in trial annually—the firm runs circles around everyone else."[6] Before there was Quinn Emanuel, Boies Schiller, or Bartlit Beck, Steve Susman and Lee Godfrey founded America's first trial boutique. Today, some of the most sophisticated purchasers of litigation services rely on SG for all kinds of trials: Chevron, General Electric, Texas Instruments and Wal-Mart to name a few. For nearly 40 years, the Firm has been winning trials on both sides of the docket, with plaintiffs' verdicts totaling billions and billions of dollars. Susman Godfrey's track record of success is

---

[6] Katrina Dewey, *Don't Mess With Texas*, Lawdragon, Dec. 3, 2017, at
https://www.susmangodfrey.com/wp-content/uploads/2018/01/sg-2017-lawdragon-feature-dont-mess-with-texas-1-1.pdf.

reflected in its wide recognition as one of the nation's leading trial firms, including being named as the number one "litigation boutique" law firm by Vault for the past eight years.[7]

The Firm's track record of plaintiffs-side successes began in 1980 with *Corrugated Container*, where Steve Susman obtained an award of more than $550 million for victims of a nationwide price-fixing conspiracy, the largest jury verdict of its time. In recent years, SG's landmark class victories have continued, including: more than $1 billion in settlements in an ongoing price-fixing case against auto-parts manufacturers,[8] settlements valued at approximately $1.6 billion in an unfair competition case against Toyota and other automakers,[9] and a settlement valued by the district court at over $130 million in a case against Phoenix Life Insurance, where the Chief Judge of the Southern District of New York praised the result as "an excellent, excellent result for the class" and "the best settlement pound for pound for the class that I've ever seen."[10] SG has also led two of the largest price-fixing class

---

[7] *2019 Best Litigation Boutique Law Firms*, Vault, at http://www.vault.com/company-rankings/law/best-law-firms-in-each-practice-area?sRankID=276&rYear=2019.

[8] *See In re Auto. Parts Antitrust Litig.*, 12-md-2311 (E.D. Mich.).

[9] *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 8:10-ml-02151 (C.D. Cal).

[10] *Fleisher v. Phoenix Life Ins. Co.*, 11-cv-8405 (S.D.N.Y.), at https://bit.ly/2TqDi51 (p. 3).

actions in the country centering on misconduct in the financial markets: *LIBOR* and *Municipal Derivatives*.[11] In *LIBOR*, SG, as co-lead counsel, has secured $590 million from just 4 of the 16 defendant banks.[12] In *Municipal Derivatives*, SG, as co-lead counsel, led the first major financial market rate-rigging case in New York, and obtained hundreds of millions in recoveries.[13] Last year, SG also won a unanimous, $706.2 million jury verdict for real estate analytics company House Canary. *See generally* Connors Decl. ¶¶ 13-14.

Even among this impressive slate of victories, SG's success in the False Claims Act arena stands out from the pack. Recently, in *United States ex rel. Kester v. Novartis*, 11-cv-8196 (S.D.N.Y.), SG, in collaboration with the Department of Justice, secured settlements totaling $465 million in recoveries for the Government in a novel anti-kickback case, which for a case of its kind is the largest recovery ever. *See* Connors Decl. ¶ 15.

---

[11] *See In re Municipal Derivatives Antitrust Litigation*, MDL No. 1950 (S.D.N.Y.) (VM); *In re Libor-Based Financial Instruments Litigation*, MDL No. 2262 (S.D.N.Y.) (NRB).

[12] *Susman Godfrey L.L.P. and Hausfeld LLP Secure $240 Million Deutsche Bank LIBOR Settlement*, Susman Godfrey, March 2018, at https://www.susmangodfrey.com/news-awards/sg-news/susman-godfrey-l-l-p-and-hausfeld-llp-secure-240-million-deutsche-bank-libor-settlement/; Jonathan Stempel, *HSBC to pay $100 million to end Libor rigging lawsuit in U.S.*, Reuters, at https://www.reuters.com/article/us-hsbc-libor-settlement/hsbc-to-pay-100-million-to-end-libor-rigging-lawsuit-in-u-s-idUSKBN1H6009.

[13] Pete Brush, *$100M In Settlements Ends Class Action in Muni Bond MDL*, Law360, July 8, 2016, at https://www.law360.com/articles/815462.

Lead counsel Bill Carmody and his team had the skill and credentials needed for this complex nationwide case, and they prosecuted this case with skill and efficiency. Carmody has decades of first-chair trial experience in high-stakes cases. He is a member of the American Board of Trial Advocates, a fellow of the Litigation Counsel of America, and a fellow of the American Bar Foundation. He is listed in *The Best Lawyers in America* in five categories, including Bet-the-Company Litigation. His peers have voted him both a "New York Super Lawyer" and a "Texas Super Lawyer." Carmody was also a top three finalist in 2018 for the *New York Law Journal*'s Attorney of the Year. He has been honored by *Law360* as one of its 10 Titans of the Plaintiffs Bar, named to the *National Law Journal's* list of Elite Trial Lawyers, and is routinely included in *Benchmark's Top 100 Trial Lawyers.* He is perennially listed in the *Lawdragon 500*, the guide to America's leading 500 lawyers and was lauded as one of its 41 "Legal Legends."

Last year, Carmody was called in just months before trial to handle one of the most widely reported cases in Silicon Valley history. Uber was defending itself against trade-secret claims by Google/Waymo seeking roughly $2 billion, and decided it "was important to have someone in the leading position who was a pure

trial lawyer—someone whose core skill was persuading a lay jury in a complex business case."[14] So it tapped Bill Carmody.



Four days after Bill gave public and sealed opening statements and he and his team crossed the plaintiff's witnesses, Uber walked away with a settlement that was worth a fraction of what Google/Waymo sought. Only two-and-a-half months before the Uber trial, on the other side of the country, Bill tried a contract case on the plaintiff's side for General Electric in the Southern District of New York, where the jury sided unanimously with GE and the court entered a judgment valued at over $160 million. For over two decades, Bill has tried bet-the-company cases all around America on both sides of the "v." *See* Connors Decl. ¶ 16 & Ex. 2.

The skill and expertise of Carmody's team also underscores the reasonableness of the rates of the attorneys here. Each of the attorneys working with Carmody at SG graduated at the top of their respective law school classes, each have stand-up argument and trial experience, and clerked for judges on the Federal bench, with three serving as clerks for Justices on the United States Supreme Court. *See* Connors Decl. ¶ 17 & Ex. 3-7. This was precisely the skill set necessary for this case,

---

[14] Christine Simmons, *Attorney of the Year Finalist: Bill Carmody*, N.Y.L.J., Oct. 5, 2018, at https://www.susmangodfrey.com/wp-content/uploads/2018/10/SG-Carmody-Video.pdf.

which involved multiple rounds of briefing on novel and complex issues of the application of Medicare manuals to BSNC's conduct; recreating thousands of patient files when BSNC refused to produce those files electronically (which it could have, but refused to do); and securing through depositions the critical admissions that Relators could not obtain from documents due to BSNC's refusal to produce further documents upon SG's entry to the case.

The performance and quality of opposing counsel was also exceptional. BSNC was represented by lead counsel Rick Robinson and his team from Reed Smith LLP. Rick Robinson is the global head in charge of all FCA litigation at his firm, and has a demonstrated record at the top of the defense FCA bar. Robinson and his team fought this case hard. The determination and competence of opposing counsel underscores that SG prosecuted this case with skill and efficiency. *Yedlowski*, 2016 WL 6661336, at *21 (stating "[t]he quality and vigor of opposing counsel" is relevant when evaluating the quality of services rendered by Lead Counsel).

Moreover, SG's hourly rates are appropriate for a case of this nature. FCA litigation is inherently complex, requiring navigation of intricate Medicare rules and regulations. Here, the alleged conduct dealt with a nationwide scheme to defraud Medicare affecting thousands of patients across the country and involving thousands of claims. The nationwide scope of the conduct at issue and the complexities

involved in this case prompted the parties to serve expert reports from six different experts with BSNC alone relying upon four different experts. In addition, SG seeks attorney fees based on the normal hourly rates charged by the firm, which numerous clients have paid without question. Connors Decl. ¶ 18. Given the contingent nature of this case, however, the firm would typically enter into a fee agreement that provides a premium on top of its normal hourly rate to account for the additional risk. Here, despite the risk the firm faced with this fully contingent case, SG seeks its ordinary hourly rate without the additional premium. Connors Decl. ¶ 25.

SG's hourly rates are also reasonable for the relevant forum. This case was filed in the District of New Jersey in Newark, New Jersey. This forum fairly consists of its adjacent cities that are economically integrated, including New York City. Practitioners from New York frequently appear in this Court and litigants in the District of New Jersey in Newark often seek counsel from New York City. *See, e.g.*, *Phillips Elecs. N. Am. Corp. v. Compo Micro Tech, Inc.*, 2006 WL 3020724, at *5 (D. Del. Oct. 23, 2006) (approving New York City law firm's hourly rates in Delaware); *Marthers v. Gonzales*, 2008 WL 3539961, at *3 (E.D. Pa. Aug. 13, 2008) (approving requested attorney's fees based on the prevailing market rate of "New York/New Jersey").

Even if this Court localized the forum to Newark alone, the requested fee equates to a blended hourly rate of approximately $618. *See* Connors Decl. ¶ 24.

21

This blended rate is commensurate with the hourly rates charged in Newark. This Court, for example, has previously awarded rates nearly identical to those requested here. *See, e.g.*, *Dartell v. Tibet Pharm. Inc.*, 2017 WL 2815073, at *11 (D.N.J. June 29, 2017) (Vazquez, J.) (approving attorneys' fees where the lodestar cross-check resulted in a blended hourly rate of $670, noting that "it is based upon a reasonable hourly rate for such services given the geographical area, the nature of the services provided, and the experience of each attorney"). Likewise, in *P. Van Hove BVBA v. Universal Travel Group, Inc.*, 2017 WL 2734714 (D.N.J. June 26, 2017) (Vazquez, J.), this Court approved counsel's percentage of the recovery fee in a case in which the lodestar cross-check established a blended hourly rate of $644. *Id.* at *13. The lode-star cross check resulted in a multiplier of 2.2, meaning counsel's ultimate attorney fee award was 2.2 times their blended hourly rate of $644 (*i.e.*, $1416/hour). *Id.* Here, SG's blended rate of $618 is eminently reasonable given the skill and experience of the attorneys, the complexity of the subject matter, and the nationwide scope of the fraudulent conduct. *See also Talone v. Am. Osteopathic Ass'n*, No. 1:16-CV-04644-NLH-JS, 2018 WL 6318371, at *17 (D.N.J. Dec. 3, 2018) (approving blended rate of $601).

In the FCA context, courts are reluctant to substantially reduce a relator's attorney's fees. Reducing the attorney's fees "would discourage attorneys from investing the time and resources to bring a *qui tam* action, thereby undermining the

purpose of the FCA." *United States ex rel. Joseph F. Tommasino, P.A., PhD v. Guida*, No. 10CV4644JFBAKT, 2017 WL 878587, at \*2 (E.D.N.Y. Mar. 6, 2017); *see also U.S.A. v. CDW-Government, Inc.*, No. 305CV00033DRHPMF, 2013 WL 11267176, at \*12 (S.D. Ill. May 17, 2013) (rejecting argument that attorneys' fees in FCA case was disproportionate to recovery, noting the FCA is designed to incentivize attorneys to engage in meritorious FCA litigation).

## IV. SG'S REQUESTED FEES AND EXPENSES ARE REASONABLE GIVEN THE EXCELLENT SETTLEMENT OBTAINED

BSNC may argue that the amount of SG's requested attorney fees and costs is not reasonable in light of the value of the settlement. The Court should respectfully shut the door on this after-the-fact excuse. In real time when this case was being fought, BSNC took the position that the maximum amount of actual damages in this case was $469,072.64, and that the United States Constitution imposed a hard cap of four times the actual damages, for a maximum judgment of $1,876,290.56. *See* Dkt. 299-29 at 69 (arguing that "the Court should hold that if any penalty is to be awarded in this case, it cannot exceed the bounds of the Excessive Fines and Due Process Clauses, or, more precisely, exceed four times the alleged actual damages"); Dkt. 333 at 20, 25 (arguing that the Court should hold that "the amount of any punitive damages ultimately awarded to the relators, if any, will be no more than four times the amount of actual damages they are able to prove" and that the

"maximum amount of alleged actual damages in this case is $469,072.64"). **Well, guess what? That means BSNC paid *more than the constitutional maximum* to settle this case.** *See* Connors Decl. ¶¶ 10-12.

Separately, courts around the Nation have made clear that lodestar, and not the dollars obtained in a settlement, is the proper measure of fees in a "private attorney general" case like this one. In fact, relators are entitled to recover their lodestar even where they vastly exceed the actual damages recovered. *See, e.g.*, *Graves v. Plaza Medical Centers Corp.*, No. 1:10-23382-CV, 2018 WL 3699325 (S.D. Fla. May 23, 2018), *report and recommendation adopted*, No. 10-23382-CIV, 2018 WL 3697475 (S.D. Fla. July 13, 2018) (awarding $4 million in attorneys' fees and expenses in FCA case that settled for $3 million); *United States ex rel. Begole*, 2012 WL 13071028 (C.D. Cal. Jan. 26, 2012) (awarding $489,167 in attorneys' fees in FCA case where actual damages to the government amounted to $6,750, a ratio of more than 72:1); *U.S. ex rel. Virgin Islands Housing Auth. v. Coastal General Const. Servs.*, 299 F.Supp.2d 483 (D.V.I. 2004) (stating relator is entitled to attorneys' fees despite there being no actual damages in FCA case); *McAfee v. Boczar*, 738 F.3d 81, 94 (4th Cir. 2013) (stating that a "substantial disproportionality between a fee award and a verdict, standing alone, may not justify a reduction in attorney's fees"); *City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986) stating that an award of attorney's fees may be greater than a plaintiff's damages, since

"reasonable attorney's fees . . . are not conditioned upon and need not be proportionate to an award of money damages"); *Barbour v. City of White Plains*, 700 F.3d 631, 635 (2d Cir. 2012) ("[W]e have repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation" (internal quotations and citations omitted)).

## V.   SG'S COSTS AND EXPENSES ARE REASONABLE

SG is entitled to recover reasonable costs and expenses from BSNC pursuant to 31 U.S.C. § 3720(d)(2). SG seeks costs and expenses in the amount of $879,173 (and, now, at least another $29,698.34 in costs and expenses related to litigating this fee petition).[15] The expenses are backed up by contemporaneous detail on their amount and purpose. The Third Circuit has held that recoverable costs and expenses include those "reasonable out-of-pocket expenses" incurred by the attorney which are "normally charged to a fee-paying client, in the course of providing legal services." *Planned Parenthood v. AG*, 297 F.3d 253, 267 (3d Cir. 2002) (internal quotations and citations omitted). Such expenses include reasonable charges for expert fees, travel, photocopying, long distance telephone, electronic research, postage, and filing fees. SG routinely charges its paying clients for the costs and expenses it seeks here. *See* Connors Decl. ¶ 20 & Ex. 10.

---

[15] SG has excluded from its reimbursement request the retainer paid to Justin Walder for the consulting services he provided in connection with this fee application, further confirming the reasonableness of SG's request.

BSNC may argue that SG's travel expenses are not reasonable. But there is no question that "[i]n fee shifting cases, travel time and related expenses are recoverable in the Third Circuit." *Avaya Inc. v. Telecom Labs, Inc.*, 2016 WL 10590071, at *25 (D.N.J. Sept. 16, 2016). SG's billing of travel expenses was at all times in accordance with the firm's billing guidelines applicable to paying clients, and therefore consistent with Third Circuit law as expressed in *Planned Parenthood*.

BSNC may also claim that SG's research charges for Westlaw are excessive given that SG was retained after the Court denied BSNC's motion to dismiss. However, from the time SG first entered the case over 3.5 years ago, it has relied on Westlaw to conduct research for countless letter motions, motions to compel, *Daubert* motions, summary judgment motions, over twenty motions *in limine*, mediation statements, and more. In fact, at the outset of the case, BSNC insisted that SG *not* rely on any prior work-product from the Relators' prior counsel, forcing SG to "remake the wheel" on even basic research issues in the case. Moreover, "[t]he charges for such online research may properly be included in a fee award, where a firm normally bills its paying clients for that cost, because the use of online research likely reduces the number of hours required for an attorney's manual search." *Nat. Elec. Ben. Fund v. Starko Elec. Services, Inc.*, 2010 WL 1049980, at *5 (D.N.J. March 6, 2010) (internal quotations and citations omitted). As with SG's travel costs,

26

the Westlaw research charges were made in accordance with SG's firm-wide billing guidelines.

Finally, the best measure of the reasonableness of SG's costs and expenses is that counsel paid for them out of pocket, on a full contingency. SG bore substantial risk of non-payment, and this is precisely why SG made sure that it minimized its costs and expenses at every turn, and why SG requires that any costs or expenses be in accordance with firmwide policies on billing.

## <u>CONCLUSION</u>

Pursuant to the FCA's fee-shifting provisions, Relators respectfully request that this Court order BSNC to pay $6,628,709.50 in fees and $879,173.48 in costs and expenses related to litigating the merits of the case, for a total of $7,507,882.98. In addition, Relators request that the Court order BSNC to pay the costs attendant with litigating the fee dispute which, to date, includes $84,327.50 in fees and $29,698.34 in costs and expenses, for a total of $114,025.84. In total, Relators request that this Court order BSNC to pay SG $7,621,908.82. For the foregoing reasons, SG's motion for fees, costs, and expenses respectfully should be granted.


Date:  June 21, 2019

By: */s/  Grant W. McGuire*

William Christopher Carmody
Arun Subramanian

27

Mark Musico
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY   10019-6022
Phone:  (212) 336-8330
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
mmusico@susmangodfrey.com

Jordan W. Connors
SUSMAN GODFREY L.L.P.
1201 Third Ave., Suite 3800
Seattle, WA  98101
Phone:  (206) 516-3814
jconnors@susmangodfrey.com

Michael Gervais
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mgervais@susmangodfrey.com

Grant W. McGuire
MCMANIMON, SCOTLAND & BAUMANN, LLC
75 Livingston Avenue, 2nd Floor
Roseland, NJ 07068
Phone: (973) 622-4868

*Attorneys for Relators/Plaintiffs*